Grant S. KESLER, James D. Fahs, Jr., G. Michael Tuckett, Marvin J. Kirkham, General Partners of Elks Associates, a Utah Limited Partnership, Plaintiffs and Respondents,

v.

ELKS BUILDING, N.V., a Netherlands Antilles corporation, and Western States Title Company, a Utah corporation, Defendants and Appellant.

Grant S. KESLER, James D. Fahs, Jr., G. Michael Tuckett, Marvin J. Kirkham, General Partners of Elks Associates, a Utah Limited Partnership, Plaintiffs and Appellants,

v.

ELKS BUILDING, N.V., a Netherlands Antilles corporation, Defendant and Respondent.

No. 17939, 17975.

Supreme Court of Utah.

Aug. 23, 1984.

Joseph C. Rust, Salt Lake City, for Elks Bldg.

Jeffrey Jensen, Salt Lake City, for Western States Title Co.

Mary Lou Godbe, Craig S. Cook, Salt Lake City, Utah, for plaintiffs and respondents.

HOWE, Justice:

This case involves the interpretation of an escrow agreement which was made in connection with a contract for the sale of the Elks Building in Salt Lake City, Utah.

Defendant Elks Building, N.V., a Netherlands Antilles corporation (buyer), appeals from and seeks the reversal of the trial court's judgment which awarded all of the funds placed in escrow at the time of the sale of the building to the sellers, plaintiffs Grant S. Kesler, James D. Fahs, Jr., G. Michael Tuckett, and Marvin J. Kirkham. Sellers are general partners of Elks Associates, a Utah limited partnership. They seek an affirmance of the judgment and also cross-appeal seeking a reversal of the trial court's judgment awarding damages to buyer on its counterclaim for sellers' failure to make certain repairs to the premises. Both parties additionally seek an award of attorney fees incurred during both the trial and this appeal.

## FACTS

In late 1978 and early 1979, the sellers and buyer negotiated the sale and purchase of the building. The buyer carefully exam-

ined and scrutinized the income and expenses which could fairly be expected. This analysis was complicated because the sellers' lease with one of the tenants, The Cinegrill, Inc., a restaurant, did not provide for an established minimum or base rent. This lease, which was for a five-year term with an option to renew for two successive five-year terms, commenced March 1, 1979. It provided in § 3.01 that for the first eighteen months the rent would be six percent of the tenant's gross sales. At the end of the eighteen-month period, the rental which had been paid by the tenant for the last twelve months would be averaged and that amount would become the minimum rent for the remainder of the term of the lease. In no event, however, could it exceed $6 per square foot per year. Section 3.02 provided that:

> In addition to the aforesaid minimum rental, when established the Tenant shall pay to the Landlord a sum of 6% of Gross sales as reflected by the Tenant's sales tax receipts and report filed with the State of Utah. At the expiration of the initial Eighteen months of the lease and based upon the rents paid as derived from the 6% of Gross sales in any quarter wherein the percentage rents fall below the minimum rents—minimum rents shall be paid.

On March 16, 1979, the parties entered into a written contract of sale. The purchase price was fixed at $4,100,000. That figure was reached by taking the fixed minimum annual income of the building (including the maximum base rent of The Cinegrill) and capitalizing it at 9.5 percent, which came to approximately $3,900,000. The remaining $200,000 (sometimes referred to as the "blue sky" above the building) was added to compensate for overrents and other income expectations. However, since the eighteen-month period of The Cinegrill lease had just started to run, there was no way of knowing what its minimum rental would be after the end of that period on August 31, 1980. Since the sales price of the building was tied very closely to the capitalization of the minimum rental of the tenants of the building, it was

determined by the sellers and buyer that an escrow account would be established to provide for the uncertainty of the minimum rent which The Cinegrill would be obligated to pay at the end of the eighteen-month period. The parties calculated the difference between the optimum amount The Cinegrill might have to pay as minimum rent per year ($6 per square foot or $41,022) and the amount The Cinegrill had already paid as advanced rent for the last twelve months of the eighteen-month period ($18,000) and capitalized that difference at 9.5 percent. The resulting $242,337 was placed into an escrow account with the Western States Title Company.

The escrow agreement provided that one month after the end of the eighteen-month period, to wit, September 30, 1980, Western States would make distribution of the funds held in escrow to the sellers or to the buyer or to both, according to a formula based upon the amount of rent actually paid by The Cinegrill during the crucial twelve-month period from September 1, 1979, to August 31, 1980. If that rent was $41,022, the full amount of the funds would be payable to sellers. However, if that rent fell below $41,022, the capitalized amount of the deficiency was to be paid to the buyer and any balance to the sellers.

The escrow agreement also contained in paragraph three what the parties have termed an "acceleration clause." It is the interpretation of this clause which gives rise to the dispute which prompted this action. That clause provided:

> 3. If during the eighteen month period of the Escrow, buyers are able to effectuate a written amendment of the lease with Cinegrill, Inc. fixing a minimum base rent of six Dollars per square foot, *with all other lease terms and conditions remaining the same*, then the terms of the Escrow shall be deemed satisfied and all escrow funds shall be released to Sellers. [Italics added.]

Following the execution of the contract of sale and the escrow agreement, the sellers continued to manage the building for

the buyer. Over a period of several months, the sellers proposed to The Cinegrill amendments to the lease which they thought would satisfy the acceleration clause and bring about the immediate release of the escrow funds to them. Finally, on October 4, 1979, The Cinegrill agreed to and executed an amendment to the lease, the details of which are not important here except that sellers believed that they met the terms of the acceleration clause. The amendment was mailed to the buyer, which found it unacceptable and refused to sign it. Shortly thereafter, the sellers commenced this suit for the payment of the escrowed funds to them under the acceleration clause.

Buyers then undertook to negotiate directly with The Cinegrill an amendment to the lease which would definitely fix the minimum rent to be paid after the end of the eighteen-month period. On January 30, 1980, an amendment to §§ 3.01 and 3.02 of the lease was executed by them which provided that until September 1, 1980, the lease payments would continue to be six percent of gross sales, but that commencing on that date, The Cinegrill would pay a flat rent of $41,000 the first year and $56,000 per year thereafter. It was further provided that that amount would be adjusted every twelve months to reflect any increases or decreases in the Consumer Price Index (CPI). Section 3.02 providing for percentage rent was eliminated. The term of the lease was extended from five years to fifteen years. A four percent late charge on any payment of rent was inserted. The buyer thereafter maintained, however, that the amendment did not activate the acceleration clause and steadfastly refused to agree to the release of the escrow funds to the sellers. While this action was pending in the trial court, the eighteen-month period expired. Western States Title Company thereafter issued a letter to the sellers and buyer that the actual rental paid by The Cinegrill during the last twelve months came to $20,465.67 (about $3 per square foot) and consequently the $242,337 in escrow should be divided, according to the formula in the escrow agreement, $25,-

955.10 to the sellers and $216,381.90 to the buyer. That plan of distribution did not meet with the approval of the sellers and this action went to trial. The trial court ruled that the amendment activated the acceleration clause and the sellers were entitled to the entire escrow amount, less $140,352. The court awarded that amount to the buyer on its counterclaim for breach by the sellers of the Agreement to Repair which had been made at the time of the sale.

## THE ACCELERATION CLAUSE

The buyer contends that the acceleration clause was not activated, theorizing that had The Cinegrill done well during the twelve-month base period, the minimum rent might well have been established at the maximum of $6 per square foot and, in addition, buyer would have been entitled under § 3.02 to six percent of the gross sales which would have yielded another $6 per square foot, making a total rent (minimum and percentage rent) of $12 per square foot. Thus, buyer's argument continues, when it entered into the January 30 amendment, it committed The Cinegrill to more than $6 per square foot plus a CPI adjustment, but it lost the expectation of percentage rents under § 3.02. Therefore, the requirement of the acceleration clause of "all other lease terms and conditions remaining the same" was not met and satisfied.

■ Preliminary to a consideration of the buyer's contention we observe that the parties seem to agree that the phrase "all other lease terms remaining the same," was intended to mean that the economic benefit of the lease to the buyer should not be diminished by virtue of the amendment deleting or altering other lease terms which were beneficial to it. Technical changes and changes of form which did not reduce the values of the lease to the buyer were not meant to be excluded by that phrase. We agree with that construction.

■ Three requirements were needed to set the acceleration clause in action: (1)

During the eighteen-month period of the escrow, buyers would be able to effectuate a written amendment of the lease with Cinegrill, Inc., (2) fixing a minimum base rent of $6 per square foot, (3) with all other lease terms and conditions remaining the same. There is no question but that (1) and (2) were fully satisfied. The amendment was made during the eighteen-month period and a fixed rent in excess of $6 per square foot was agreed to in the amendment. The rent for the first year of $41,000 amounts to $6.36 per square foot. In subsequent years, the rent would yield $8.60. The difficulty comes in determining whether the third condition was met, viz., whether "all other lease terms and conditions [remained] the same." At this point it cannot be definitely determined whether the percentage rents which were eliminated by the amendment would have been of greater economical benefit to the buyer than the benefits it gained by virtue of the amendment. While the buyer had hoped that the percentage rents might amount to the equivalent of an additional $6 per square foot, it candidly admits that when the amendment was made, the sales record of The Cinegrill to that date was poor. The lease had then run ten months and The Cinegrill's rent payment of six percent of gross sales amounted to the equivalent of only $3 per square foot. (This pattern continued throughout the eighteen-month period.) Thus, it was apparent that the buyer's expectation would probably not be realized. Unless sales markedly increased, under § 3.02 percentage rents would amount to only $3 per square foot, not $6. The buyer lost its right to percentage rents by virtue of the amendment but gained several important concessions. The minimum rent for the first year was fixed at $6.36 per square foot and for the remaining twelve and one-half years at $8.60 per square foot—not far below the $9 per square foot which the lease would probably have produced for the buyer had The Cinegrill agreed to $6 per square foot and had percentage rents not been eliminated. In addition, the buyer gained the right to tie the rent to an annual CPI increase. The term of the lease was extended ten years which could be of economic benefit to the buyer, and a four percent late charge on any delinquent rent was agreed to. There was, therefore, evidence before the trial court that the amendment conferred substantial monetary benefits to the buyer equal to or greater than the expected percentage rents which it gave up. From this evidence, the trial court was justified in concluding that condition (3) of the acceleration clause was met and satisfied. We further observe that to a large extent the determination of whether one party or the other gained or lost by the elimination of percentage rents and by the substitution therefor of other terms entails a subjective judgment. Perhaps in the last analysis the fact that the buyer and The Cinegrill both agreed to that course would indicate their satisfaction with it. Presumably neither of them thought they were losing any significant economic advantage over the other.

Our conclusion is further bolstered by the fact that at the time the amendment was made, there was dispute as to the interpretation of the original lease. Both the seller and The Cinegrill maintained that construing §§ 3.01 and 3.02 together, the intent was that after the initial eighteen-month period, the tenant would pay only the greater of the minimum base rent or the percentage rent. The buyer maintained that the obligation of the tenant was to pay the percentage rent in addition to the minimum base rent. The trial court observed that the lease lacked clarity in this aspect. Assuming that the buyer may have prevailed in any litigation over that question, it was a viable issue on January 30, 1980, and as the buyer points out, could have resulted in a determination adverse to it in any litigation if parol evidence were admitted as to the intentions of the contracting parties (sellers and The Cinegrill). The amendment eliminated this lurking problem and fixed the rent to be paid by The Cinegrill. Again, this may be viewed as having significant economic value for the buyer.

We thus conclude there was evidence that all three conditions of the acceleration clause were fulfilled and the lower court did not err in directing that the full amount held in escrow be paid to the sellers.

## THE AGREEMENT TO REPAIR

Contemporaneously with the execution of the contract for the sale and purchase of the building, the sellers and buyer executed a separate written Agreement to Repair. It provided that before June 30, 1979, the seller would at its expense

complete or cause to be completed all remodeling, renovation, construction and repairs to make the building operational which were by the Seller on date of December 19, 1978, projected and intended to be completed as part of the Sellers' development and remodeling plan and program for the subject property, according to plans and specifications and which shall include but not be limited to each of the following . . . .

Four specific repairs to the building and to the decorative garden wall were then listed. Sellers' development and remodeling plan and program referred to the renovation of the building to adapt it for commercial use. Sellers had started that project after their purchase of the building in 1976. The renovation had been substantially completed by early 1978.

Although the sellers contended that they had completed all repairs required of them under the Agreement to Repair, the trial court held that further repairs were necessary and awarded the buyer on its counterclaim the following amounts to repair the following items:

1. $36,500 for repairs to walls on south side of property.
2. $3,054 for sump pump to drain water accumulated in sump.
3. $200 for installation of waterline to planter box.
4. $1,300 for interior plastering and painting.
5. $99,298 for repair of roof.

Total: $140,352

■ The sellers assail the granting of damages on the first four items, contending that they were not responsible for the sump pump, the waterline and the interior plastering because they were not included in the plans and specifications of the renovation project and that they did repair the decorative garden wall at a cost to them of $8,000. We find no error in the trial court's award of damages for these items. While it is true that the sump pump was not provided for in the plans and specifications, there was testimony that the pump was necessary to drain water from the sump which had been improperly constructed in the renovation. The plans and specifications provided for the planter, and the waterline to it was necessary to make it functional. As to the plastering and painting, there was testimony that it was necessary to fill holes in the walls and around the door frames and stairwell between the fifth and sixth floors in the building which had been left from the renovation work. The sellers produced no contrary evidence. As to the award of damages to repair the south decorative wall, even though the sellers had made a good-faith effort to repair it, there was evidence from which the trial court could have concluded that the repairs were either inadequately made or were not made in a good and workmanlike manner which necessitated further repairs. The Agreement to Repair specifically dealt with this wall and provided that the sellers should "assure the reasonable durability" of their repairs to it.

As to item No. 5, roof repairs, the sellers do not dispute that it came within the purview of the Agreement to Repair. At the time of the sale, a section of the roof of the building leaked apparently because the contractor in renovating the building had failed to install a waterproof membrane. The sellers had requested the contractor to repair the problem, but he declined on the ground that he had complied with his contract. He believed that the leakage was created when tenants destroyed the caulking by running shovels over the roof, apparently to remove accumulated snow. Sellers attempted to correct the leakage by

caulking the roof in the spring of 1979 after the sale of the building, but that effort was not completely successful. Shortly after the sale, one of the sellers furnished to the buyer's attorney a copy of the construction agreement between the sellers and the contractor. An accompanying letter stated that the attorney should give notice to the general contractor of his failure to perform and that the sellers would be willing to execute an assignment of the construction contract to the buyer. The defendants' attorney made no demand upon the contractor until October 19, 1979. At that time he informed the contractor that the buyer had purchased the building together with an assignment of the sellers' interest in the construction contract "for the purpose of making available to our client the remedies afforded in the contract for deficiencies and defects in the work performed upon the Elks Building property." The contractor responded by again denying liability. No written assignment of the construction contract was ever executed by the sellers to the buyer, although the buyer's attorney drafted an assignment and intended to present it to the sellers. As a result of the controversy over the escrow he did not present it.

■ Sellers argued in the trial court that the preceding facts clearly established equitable estoppel and prevented buyer from now making any claim against the sellers for repair of the roof. The estoppel is premised on the assertion that the buyer assumed the responsibility to pursue the contractor to make the repairs and that sellers relied upon that assumption for nearly a year. They assert that any legal recovery against the contractor may have been barred by the delay. The trial court was not persuaded by that argument and found that the buyer had not accepted an assignment of the construction contract in satisfaction of any claims it had against the sellers. Furthermore, the court found that the buyer did not assume the burden of going forward against the contractor and did not induce the sellers to rely thereon. These findings are supported by competent evidence, and we will not disturb them on appeal. It is fundamental that the sellers were obligated under the Agreement to REpair to remedy the leakage of the roof. Although the buyer's attorney expressed willingness at times to pursue the contractor and made some effort, the ultimate responsibility lay with the sellers and could not be shifted to the buyer. Apparently the sellers did not follow up on the buyer's pursuit of the contractor and they cannot now complain that the buyer did not discharge the responsibility which was theirs. In sum, we find no error in the judgment awarded the buyer on its counterclaim.

## ATTORNEY FEES

■ Both the escrow agreement and the Agreement to Repair provided that in the event either party defaulted in the performance of its terms and conditions, the defaulting party would pay a reasonable attorney fee incurred by the other party in enforcing the agreement. The trial court found that the sellers had breached the Agreement to Repair and that the buyer had breached the escrow agreement and, therefore, declined to award any attorney fees to either party. Apparently the trial court concluded that sellers and buyer had both incurred equal legal expense in enforcing the agreement on which they prevailed. We find no error in that approach and for that reason also deny any award of attorney fees on appeal.

The judgment below is affirmed in its entirety. No costs on appeal are awarded.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

ZIMMERMAN, J., does not participate herein.