2007 UT App 175

**BONNEVILLE DISTRIBUTING COMPANY, a Utah corporation, Plaintiff, Appellant, and Cross-appellee,**

v.

**GREEN RIVER DEVELOPMENT ASSOCIATES, INC., a Utah corporation; William S. Greaves; and Stanley De Waal, Defendants, Appellees, and Cross-appellants.**

No. 20060219–CA.

Court of Appeals of Utah.

May 24, 2007.

See also 277 F.3d 1251.

Richard D. Burbidge and Stephen B. Mitchell, Salt Lake City, for Appellant.

George A. Hunt and Kurt M. Frankenburg, Salt Lake City, for Appellees.

Before GREENWOOD, Associate Presiding Judge, and DAVIS and McHUGH, JJ.

## OPINION

GREENWOOD, Associate Presiding Judge:

¶ 1 Bonneville Distributing Company (Bonneville) appeals the trial court's rulings that (1) dissolution of a joint venture was proper; (2) Bonneville was not entitled to a share of profits or hauling fees; and (3) neither party was entitled to attorney fees. Green River Development Associates, Inc. (Green River) cross-appeals, also challenging the trial court's determination regarding attorney fees. Green River further asserts that the trial court erred in awarding accounting damages to Bonneville. Although we reverse two of the trial court's rulings, we affirm the ultimate result.

## BACKGROUND

¶ 2 Bonneville and Green River engaged in a joint venture (the Joint Venture) for the sole purpose of operating the West Winds Truck Stop (the Truck Stop). Initially, the Joint Venture was between Green River and Triangle Oil, Inc. (Triangle). However, in April 1987, Triangle experienced severe financial problems after, among other things, the Internal Revenue Service (IRS) issued a federal tax lien against Triangle for $1,166,206.13 in unpaid taxes. The IRS issued another tax lien against Triangle in May 1989 for $627,991.32. As a result of its financial distress, on January 1, 1990, Triangle assigned its interest in the Joint Venture to Bonneville, which, prior to this assignment, was a shell corporation with no assets. Green River consented to the assignment. Triangle also transferred most of the service stations it owned and its operating assets, including fuel trucks and trailers, to Hardy Enterprises, Inc. (Hardy).

¶ 3 Under the Joint Venture agreement (the Agreement), Green River was responsible for overseeing the operations of the Truck Stop, and Bonneville was responsible for arranging "all motor fuel ... necessary ... to accommodate [the Truck Stop's]

needs." Regarding compensation, the Agreement stated that Bonneville would receive one-half cent per gallon of all fuel sold and that it would be "paid bi-monthly a sum equal to such common carrier freight rates as are regularly charged for the delivery of motor fuel to the facility from the various points of acquisition."[1] In addition, each venturer would be allocated the net profits or net losses on a quarterly basis. The Agreement further stated that "[e]ach of the Venturers shall have an equal ownership and voice in the joint venture."

¶ 4 The Joint Venture leased the property on which the Truck Stop was located from Green River as an independent entity. Originally, the lease was for a two-year term, but was extended for an additional ten-year term, to expire on December 31, 1995. Upon the expiration of the ten-year term, the lease provided for an automatic five-year renewal period, commencing January 1, 1996, and continuing through December 31, 2000, unless the lessor, Green River, received written notice at least ninety days prior to December 31, 1995, that the lease would not be renewed.[2]

¶ 5 In 1992, the relationship between Green River and Bonneville began to unravel, first emerging with a dispute between Bonneville and Hardy. Hardy was one of several companies that provided fuel to the Truck Stop from 1987 until 1992. This relationship was based on an agreement between Hardy and Triangle, entered into before Triangle assigned its rights in the Joint Venture to Bonneville.

¶ 6 In approximately December 1992, Bonneville terminated the hauling agreement with Hardy and informed Green River that Bonneville would "make arrangements for the procurement of all motor fuels . . . to the . . . Truck Stop pursuant to the Joint Venture Agreement." In response, Green River sent a letter to Bonneville suggesting that it make arrangements for a new supplier "im-

mediately." Specifically, Green River suggested that Bonneville make arrangements with Newby–Holt Oil Company, or another company that had "multiple refinery sources in Utah as well as Grand Junction, Colorado and Bloomfield, New Mexico." Rather than engaging another distributor, Bonneville sent a letter to Green River explaining that Bonneville was "ready, willing and able to supply and deliver motor fuel pursuant to the Joint Venture Agreement." The letter also stated that Bonneville wanted to be notified "immediately of all future orders of motor fuel so that it can timely supply and deliver it to [the Truck Stop]." Bonneville, however, does not dispute that it was unable to provide all of the Truck Stop's fuel needs by itself because it had only two trucks and did not have the capacity to haul fuel from anywhere other than Salt Lake City.

¶ 7 In spite of Green River's request for Bonneville to make arrangements with a new distributor, no such arrangements transpired. As a result, from December 1992 forward, Green River made all arrangements for the supply and transportation of fuel to the Truck Stop through third parties, without any assistance from Bonneville. Green River also stopped paying Bonneville the one-half cent per gallon of fuel sold and, instead, escrowed that amount in its attorney's trust account.

¶ 8 In April 1993, Bonneville filed suit against Green River; Bill Greaves, president of Green River; and Stanley De Waal, the Joint Venture's certified public accountant (CPA), alleging breach of contract and breach of fiduciary duty. The suit derived from an accounting disagreement, which will be discussed later, and Green River's refusal to purchase fuel through Bonneville. Shortly after the suit was filed, Green River's attorney contacted the IRS to inform it that Green River had previously been involved in a Joint Venture with Triangle, that Triangle assigned its rights in the Joint Venture to

---

1. The trial court concluded that throughout the existence of the Joint Venture, hauling fees were never paid to any party. Neither party presents evidence disputing this conclusion, and there is support for it in the record.

2. Specifically, the lease stated: "Lessee shall have the option to renew this lease for one . . . additional five (5) year term. Said options shall be deemed to have been exercised unless Lessor is notified in writing ninety (90) days prior to the termination of the preceding term."

Bonneville, and that Green River possibly had money payable to Bonneville, which may be subject to the IRS's tax lien against Triangle. Green River informed Bonneville about its interaction with the IRS and suggested that the parties meet and "discuss dissolution of the joint venture on an appropriate basis."

¶ 9 After various meetings and correspondences between Green River and the IRS, the IRS asserted that the Triangle tax liens attached to Bonneville's Joint Venture interest. Moreover, IRS district counsel informed Green River that if the Joint Venture was dissolved, payment for Bonneville's interest should be made to the IRS.

¶ 10 On December 15, 1995, the IRS served Green River with another notice of levy on wages, salary, and other income in the amount of $3,774,075.27 to satisfy the tax lien against Triangle. Shortly thereafter, on December 28, 1995, Greaves, as managing partner of the Joint Venture, sent a letter to Bonneville informing it that the Joint Venture was dissolved, effective December 31, 1995. The letter stated that "[t]his dissolution is based upon the fact that Green River Development Associates … has elected not to renew the underlying ground lease to the Truck Stop property which in turn causes a termination of the Joint Venture arrangement by virtue of paragraph 3 of the Joint Venture Agreement." [3] Green River also sent Bonneville a Plan for Dissolution and Winding Up Operation of West Winds Truck Stop Joint Venture (the Plan). The Plan indicated that dissolution was a result of (1) the expiration of the lease; (2) litigation between the joint venturers; and (3) the IRS levies "respecting the partnership interest of Triangle Oil/Bonneville Distributing Company." [4] The Plan also provided that the interest of Triangle/Bonneville be tendered to the IRS. Bonneville did not consent to the Plan; however, not surprisingly, the IRS consented to being paid Bonneville's share under the Plan.

¶ 11 After dissolution, Green River continued to operate the Truck Stop as a sole proprietor. Neither party disputes that Green River failed to give written notice to Bonneville, or to itself as lessor, at least ninety days prior to the expiration of the lease extension, that the Joint Venture would not be renewing the lease. Furthermore, it is undisputed that Green River did not consult with Bonneville about its decision to terminate the lease and dissolve the Joint Venture.

¶ 12 In November 1996, all parties agreed to dismissal without prejudice to Bonneville's pending state court action so that Bonneville could file a new action asserting claims arising out of the Joint Venture's dissolution. The United States was joined as a counterclaim defendant by Green River in a quiet title declaratory judgment claim arising from the IRS tax liens on Bonneville's Joint Venture interest. *See United States v. Triangle Oil*, 277 F.3d 1251, 1254 (10th Cir.2002). Green River asserted, inter alia, that Bonneville had no standing to sue because it lost its interest in the Joint Venture when the IRS liens attached. *See id.* at 1254–55. The United States removed the case to federal court, where it was consolidated with a related case filed by the United States. The district court granted summary judgment in favor of Green River, concluding that "the IRS's actions in this case deprived Bonneville of any ownership interest in the joint venture and therefore deprived Bonneville of the ability to bring [any state law] claims." *Id.* at 1255. Bonneville appealed the federal district court's summary judgment against it to the Tenth Circuit. The Tenth Circuit held "that the IRS had every right to agree to the dissolution plan," but the court refused to hold that "by accepting the proceeds of the dissolution, [the IRS] wiped out every property right or cause of action Bonneville had

---

**3.** Paragraph three of the Agreement states: "The Joint Venture shall continue from the date first above written until dissolved as prescribed herein in accordance with the terms hereof, but in any event will terminate upon the termination of the Lease Agreement or any extensions thereof…."

**4.** An amended plan (the Amended Plan), which differed only in regard to the Joint Venture's value, was sent to Bonneville on April 18, 1996.

in relation to its joint venture participation." *Id.* at 1257. Consequently, Bonneville proceeded with its state court action.

¶ 13 In its state court action, Bonneville alleged breach of contract, fraud, conversion, and breach of fiduciary duty resulting from Green River and De Waal's failure to properly maintain the Joint Venture's books and records, Green River's wrongful dissolution, and Green River's refusal to pay profits or hauling charges to Bonneville. Bonneville's claim concerning the maintenance of the books and records emerged from an accounting issue. At the inception of the Joint Venture, the Truck Stop had a receivable of $165,492.01 owed by Green River. Accordingly, the initial balance sheet for the Joint Venture included this as an account receivable. However, De Waal, the Joint Venture's CPA, allegedly acting with Greaves's knowledge, eliminated the debt from the company's accounts receivable and equalized the venturers' capital accounts. De Waal later adjusted the accounts, classifying $169,910.92 as good will.

¶ 14 After a bench trial in June 2005, the trial court concluded that Green River breached the Agreement when it removed the $169,910.92 from the Joint Venture's accounts receivable and that Bonneville was entitled to half of that amount as well as prejudgment interest from the date of dissolution. The trial court's conclusion rested upon the fact that, per the Agreement, Green River was responsible for properly maintaining the company's books and records, and improperly booked the good will item.

¶ 15 Regarding Bonneville's additional claims, the trial court concluded that (1) Bonneville breached the Agreement because it was incapable of performing its fuel supply obligations under the Agreement and was unwilling to arrange for others to do so; (2) dissolution was not wrongful and therefore Bonneville was not entitled to any profits or any other damages from the Truck Stop's operations after December 31, 1995; and (3) Bonneville failed to establish fraud, conversion, breach of fiduciary duty, or breach of contract other than the account receivable. Finally, the trial court concluded that there

was no prevailing party, and thus neither party was entitled to attorney fees.

¶ 16 Bonneville appeals, claiming that the trial court erred in concluding that dissolution was proper. It further asserts that even if dissolution was proper, the trial court erred in concluding that Bonneville was not entitled to its share of the Truck Stop's profits through December 31, 2006. Finally, Bonneville challenges the trial court's conclusion that it was not entitled to its reasonable attorney fees.

¶ 17 Green River cross-appeals, also challenging the trial court's determination regarding attorney fees. In addition, Green River asserts that the trial court erred in awarding damages to Bonneville based on the accounting issue.

## ISSUES AND STANDARDS OF REVIEW

¶ 18 Bonneville argues that the trial court erred in concluding that dissolution was not wrongful. Green River contends that the trial court erred in awarding damages to Bonneville for Green River's alleged breach. These issues present mixed questions of law and fact. "We uphold [the] lower court's findings of fact unless the evidence supporting them is so lacking that we must conclude the finding[s are] 'clearly erroneous.'" *Chang v. Soldier Summit Dev.*, 2003 UT App 415, ¶ 12, 82 P.3d 203 (quoting *Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998)). "'In contrast, we review [the] trial court's conclusions as to the legal effect of a given set of found facts for correctness.'" *Id.* (quoting *Stubbs*, 970 P.2d at 1244).

¶ 19 Both parties challenge the trial court's order regarding attorney fees. "'Whether attorney fees are recoverable is a question of law, which we review for correctness.'" *Id.* at ¶ 13 (quoting *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 16, 40 P.3d 1119).

## ANALYSIS

### I. Dissolution

¶ 20 Bonneville asserts that dissolution was wrongful because (1) the plain language of the Agreement prohibited dissolution prior to the expiration of the lease; (2) even if the

plain language of the Agreement did not so provide, the Joint Venture was for a definite duration and was therefore not terminable until the lease expired; and (3) the lease was not terminated because there was no written notice of termination ninety days prior to the lease's expiration, and the Agreement required both parties to the Joint Venture to consent to termination. Green River responds that dissolution was proper because (1) the IRS consented to dissolution; (2) the lease was terminated; and (3) Bonneville materially breached the Agreement.

## A. The IRS

■ ¶ 21 We first address Green River's argument that dissolution was proper because the IRS consented to it. Essentially, Green River argues that the IRS stood in the shoes of Bonneville by virtue of its tax levies and hence, could participate in the dissolution decision to the same extent as could Bonneville. In *United States v. Triangle Oil*, 277 F.3d 1251 (10th Cir.2002), the federal counterpart to this case, the Tenth Circuit stated that "the record reveals [nothing] more than that the IRS simply reviewed Green River's proposed dissolution plan and agreed to accept the liquidation proceeds." *Id.* at 1259. The federal court further explained that without purchasing Bonneville's share of the Joint Venture through a foreclosure sale, the IRS lacked the power to consent to dissolution. *See id.* at 1256 ("[W]hile the levy power does provide the IRS with rights to property co-extensive with those of the taxpayer, absent a foreclosure or similar action the taxpayer still retains ownership of the property." (citations omitted)). In other words, because the IRS did not foreclose on Bonneville's Joint Venture interest, it could only accept Bonneville's dissolution proceeds and "Bonneville still retained ownership of whatever remained of its interest in the joint venture, ... [including] the rights attached to that property, e.g., a right to an accounting." *Id.* Accordingly, the IRS had only the

right to consent to being paid upon dissolution—which of course it did—and not to dissolution itself.[5] *See id.*

## B. The Plain Language of the Agreement

■ ¶ 22 We next consider Bonneville's argument that dissolution was wrongful because the plain language of the Agreement dictated that the Joint Venture was not terminable until the conclusion of the lease or any renewal thereof. Similarly, Bonneville argues that the Joint Venture's sole purpose was to operate the Truck Stop until the lease was no longer in force. Pursuant to Utah Code section 48–1–28,[6] a dissolution may occur without violating the agreement between the parties (1) "[b]y the termination of *the definite term or particular undertaking specified in the agreement*" or (2) "[b]y the express will of any partner when no definite term or particular undertaking is specified." Utah Code Ann. § 48–1–28(1)(a)–(b) (2002) (emphasis added). The Utah Supreme Court explained that section 48–1–28

> establishes in each partner an *indefeasible right to dissolve the partnership* even where the partners covenant that the partnership will continue for a number of years, the only consequence being that in a partnership for a definite term[,] the dissolving partner subjects himself to a claim for damages for breach of contract and for an accounting.... [I]n a partnership at will, ... an accounting must be the exclusive remedy since no contract has been breached.

*Graham v. Street*, 2 Utah 2d 144, 270 P.2d 456, 459 (1954) (emphasis added). Thus, regardless of the terms of the Agreement, either party to the Joint Venture possessed the right to dissolve the Joint Venture at any time, and Green River was not required to wait until the conclusion of the lease. The only relevant questions remaining are whether the Agreement specified that the Joint Venture was for a definite duration or a

---

**5.** Because the IRS's consent does not weigh on whether dissolution was proper, we need not address Bonneville's argument that the trial court improperly admitted Richard Kennedy's affidavit, which pertains only to the extent of the IRS's consent.

**6.** Under Utah law, joint ventures and partnerships are governed by the same statutory provisions. *See* Utah Code Ann. § 48–1–3.1(2) (2002) ("This chapter[, entitled 'General Partnership,'] governs the property and transfer rights of joint ventures.").

particular undertaking and, if so, whether dissolution occurred prior to the termination of that time period or completion of the undertaking. In that situation, Green River would face liability for breach of contract.

¶ 23 Paragraph three of the Agreement states: "*Duration.* The joint venture shall continue from *the date first above written until dissolved* as prescribed herein in accordance with the terms hereof, *but in any event, will terminate upon termination of the Lease Agreement or of any extensions thereof* . . . ." (Emphasis added.) There are no other references in the Agreement to dissolution.

¶ 24 After examining this language,[7] the trial court held that "[t]he Joint Venture Agreement had no specific duration and could be dissolved by either party at any time without breaching the Agreement." The trial court further explained that "[t]he Lease Agreement did not necessarily define the duration of the Joint Venture, but rather set an outside time limit, provided the Joint Venture was not dissolved earlier by one or both partners." We agree.

¶ 25 The Agreement states only that the Joint Venture will continue "until dissolved as prescribed herein in accordance with the terms hereof." The Agreement does not contain any restrictive terms regarding dissolution or any references to a specific time period or definite duration for the Joint Venture. Moreover, the language "but in any event" signifies that if the Joint Venture has not been earlier dissolved, it will unquestionably terminate at the conclusion of the lease. The end of the lease also constitutes completion of the Joint Venture's undertaking. Although the phrase "but in any event" sets an outside time limit for the Joint Venture, the parties had the option of dissolving the Joint Venture earlier.

¶ 26 To support its argument that the Joint Venture was to continue as long as it pursued its purpose of operating the Truck Stop,

Bonneville cites cases from other jurisdictions stating that the duration of a joint venture is defined by the objective of the venture, and that neither party may dissolve the joint venture until the conclusion of that objective. Although the cases Bonneville cites correctly state that proposition, three of the four cases are factually distinguishable because they involve agreements that had not been reduced to a writing. *See Zimmerman v. Harding,* 227 U.S. 489, 492, 33 S.Ct. 387, 57 L.Ed. 608 (1913) ("[A]lthough there was no express stipulation as to the duration of the partnership agreement, it was by implication to continue during the term of the lease."); *Yoder v. Hooper,* 695 P.2d 1182, 1185, 1187 (Colo.Ct.App.1984), *aff'd on other grounds,* 737 P.2d 852, 857 (Colo.1987); *Williams v. Terebinski,* 24 Ohio Misc. 53, 261 N.E.2d 920, 922 (1970). In each of these cases, the courts necessarily relied on the evidence presented to determine the existence and terms of a partnership.

¶ 27 The final case Bonneville cites, *Chandler Medical Building Partners v. Chandler Dental Group,* 175 Ariz. 273, 855 P.2d 787 (Ct.App.1993), seems to contradict Bonneville's position. In *Chandler,* the parties entered into a written partnership agreement to develop, operate, and lease or sell a medical office building. *See id.* at 789. Albeit more clearly than in this case, the agreement in *Chandler* expressly referenced and provided for dissolution at any time a partner withdrew from the partnership.[8] *See id.* at 790. When one party defaulted and therefore dissolved the partnership as per the terms of the contract, the other sued for breach of contract based on wrongful dissolution. *See id.* at 788–89. Analyzing whether a breach occurred, the court concluded that dissolution was proper because the underlying agreement "explicitly provided for [dissolution] under the terms of the agreement." *Id.* at 793. The same is true here. The Agreement does not prohibit dissolution for

---

7. The trial court concluded that the plain language of paragraph three was unambiguous, and neither party disputes that determination on appeal. Therefore, when examining the Agreement, we look only to its plain language and do not consider extrinsic evidence. *See State v. Ison,* 2006 UT 26, ¶ 46, 135 P.3d 864.

8. The agreement also included an option for the remaining partners to purchase a former partner's interest. *See Chandler Med. Bldg. Partners v. Chandler Dental Group,* 175 Ariz. 273, 855 P.2d 787, 790 (Ct.App.1993).

any reason and the terms of the contract control. *See WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 ("In interpreting a contract, we look to the writing itself to ascertain the parties' intentions . . . ." (quotations and citation omitted)). Accordingly, because the Agreement does not specify that the Joint Venture was for a definite duration or until a specific event occurred, as provided in Utah Code section 48–1–28, we conclude that the Agreement was terminable at any time. *See* Utah Code Ann. § 48–1–28. Therefore, Bonneville's argument that the Joint Venture was not terminable until the expiration of the lease is without merit.

## C. The Lease

¶ 28 Bonneville next argues that dissolution was improper because Green River did not have the authority to unilaterally terminate the lease, and Green River failed to comply with the lease's ninety-day notice provision. We agree in part. The lease renewal provision reads: *"Lessee* shall have the option to renew this lease for one . . . additional five (5) year term. Said options shall be deemed to have been exercised unless Lessor is notified in writing ninety (90) days prior to the termination of the preceding term." (Emphasis added.) Further, the Agreement provides that "[e]ach of the Venturers shall have an equal ownership and voice in the joint venture." Based on these two provisions, Bonneville asserts that dissolution was wrongful because both parties to the Joint Venture had to agree to terminate the lease and, upon making that determination, had to comply with the ninety-day written notice provision.

¶ 29 Green River does not respond to Bonneville's equal management argument, but argues instead that requiring compliance with the notice provision would do no more than require a useless act because the notice provision was strictly for Green River's benefit as lessor and "it would be illusory and nonsensical to invalidate the non-renewal on the grounds that Green River failed to give *itself* written notice of its own decision." *See Whiting Bros. Constr. Co. v. M & S Constr. & Eng'g Co.*, 18 Utah 2d 43, 414 P.2d 961,

962 (1966) (refusing to enforce compliance with a ninety-day notice provision because the party alleging non-compliance had actual notice and, therefore, requiring compliance would have been a "useless act"). However, we believe that Green River misapprehends the purpose of the notice provision.

¶ 30 While the majority of jurisdictions hold that notice requirements regarding options to extend leases are generally for the benefit of the lessor, *see* William B. Johnson, Waiver or Estoppel as to Notice Requirement for Exercising Option to Renew or Extend Lease, 2 A.L.R.4th 452, 2a (1986), this case presents an exception to that general rule because the parties agreed otherwise. The lease states that lessee, not lessor, has the option to renew the lease and that lessee, not lessor, must provide written notice to lessor that it does not want to exercise the renewal option. "[T]he general rule [is] that in order to exercise an option to renew a lease, a lessee must strictly comply with the terms of the lease's option renewal provisions." *Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited*, 2001 UT 100, ¶ 11, 40 P.3d 581. Therefore, the Joint Venture was required to provide written notice that it would not renew to Green River, as lessor, ninety days prior to termination of the current lease term. Consequently, the lease was not terminated and cannot serve as a basis for dissolution.

¶ 31 We also agree with Bonneville that because of the equal management clause in the Agreement, neither party had the authority to unilaterally exercise the non-renewal clause and terminate the lease. Rather, the Agreement provided that both parties would have to participate in such a decision. Consequently, we reject Green River's argument that the lease terminated, therefore validating dissolution of the Joint Venture.

## D. Bonneville's Breach

¶ 32 Green River argues that even if the lease continued to be in effect, dissolution was not wrongful because Bonneville had breached the Agreement as early as 1992, and therefore, in accordance with the first breach rule, Green River was entitled to

dissolve the Joint Venture. "[U]nder the 'first breach' rule 'a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform.'" *CCD, L.C. v. Millsap*, 2005 UT 42, ¶ 29, 116 P.3d 366 (quoting *Jackson v. Rich*, 28 Utah 2d 134, 499 P.2d 279, 280 (1972)). "'He can neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform.'" *Id.* (quoting *Rich*, 499 P.2d at 280). Based on this rule, Green River asserts that because Bonneville breached the Agreement in 1992, Green River was, after that point, no longer required to comply with the Agreement. We agree.

¶ 33 Based on the argument and evidence presented at trial, the trial court found that to adequately meet the Truck Stop's fuel needs, Bonneville

> had to arrange for or demonstrate an ability to: (1) Have 6–10 fuel tankers available for transportation; (2) Have refinery supply or terminal supply points available in Salt Lake City, Utah, Grand Junction, Colorado, Las Vegas, Nevada, Bloomfield, New Mexico, and Denver, Colorado; (3) Have fuel excise tax licenses in Colorado, New Mexico and Nevada; (4) Have sufficient credit and/or capital to satisfy suppliers and allow fuel purchases; and (5) Monitor fuel prices and inventories on a daily basis.

The trial court also found that (1) Bonneville was incapable of performing its responsibilities under the Agreement; (2) Green River gave Bonneville opportunities to remedy that incapacity; and (3) Bonneville failed to do so. The trial court determined that "Bonneville lacked the ability to perform the supply and transportation functions as reasonably required for viable operation of the West Winds truck stop and any evidence to the contrary is not credible." The trial court then concluded that because Bonneville was unable to perform its obligations under the Agreement, Bonneville breached the Agreement as early as December 1992.

¶ 34 On appeal, Bonneville references no evidence to contradict the trial court's findings, which are supported in the record, and does not demonstrate that the trial court's conclusions based on the facts are incorrect. *See Chang v. Soldier Summit Dev.*, 2003 UT App 415, ¶ 12, 82 P.3d 203 ("We uphold [the] lower court's findings of fact unless the evidence supporting them is so lacking that we must conclude the finding[s are] 'clearly erroneous.'") (quoting *Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998)). In 1992, Bonneville was unable to perform its duties under the Agreement, and, therefore, materially breached the Agreement. Thus, after Bonneville's breach, Green River was no longer obligated to perform its duties under the Agreement.

¶ 35 Bonneville asserts that its alleged breach was not grounds for dissolution because in Green River's December 15, 1995 letter, Green River stated that it was dissolving the company based on the termination of the underlying lease. The trial court concluded, however, and we agree, that there were several valid reasons for dissolution, including Bonneville's breach. Moreover, in both the Plan and the Amended Plan that Green River sent to Bonneville shortly after the December 15, 1995 letter, Green River indicated that dissolution was a result of (1) the expiration of the lease; (2) litigation between the joint venturers; and (3) the IRS levies "respecting the partnership interest of Triangle Oil/Bonneville Distributing Company."

¶ 36 As explained earlier, we agree with the trial court that under the Agreement, either party could dissolve the Joint Venture at any time and damages would be recoverable only if there were a wrongful dissolution. We are not convinced that Green River must be held to termination of the lease as the only justification for dissolution. Bonneville's breach of contract resulting from inability to perform its contractual duties is adequate legal justification for Green River's decision to dissolve the Joint Venture. Furthermore, we do not believe, and the trial court did not find, that Green River's failure to initiate dissolution proceedings for approximately three years vitiated the legitimacy of using the breach as grounds for dissolution.

¶ 37 In summary, we conclude that dissolution was not wrongful because (1) the Joint Venture was not for a specific duration or

until a specific objection was achieved; (2) either party could elect to dissolve the Joint Venture at any time; and (3) Bonneville materially breached the Agreement as early as 1992. Accordingly, because dissolution was not wrongful, Green River was not obligated to pay Bonneville a portion of profits realized after the breach. Moreover, we affirm the trial court's refusal to award Bonneville damages on the grounds that Bonneville failed to establish fraud, conversion, or breach of fiduciary duty.

## II. Bonneville's Damages Award

█ ¶ 38 On cross-appeal, Green River argues that the trial court erred in awarding damages to Bonneville for the accounting reclassification because good will was included in the valuation of the Joint Venture in the federal IRS levy case. More specifically, Green River claims that the $169,910.92 was "considered in the final valuation," and that the IRS accepted the Plan of Dissolution in consideration of the balance sheet, which reflected the good will. Therefore, Green River argues, by awarding Bonneville $84,955.46, half of the good will, after the IRS had been paid Bonneville's portion of the Joint Venture value, Bonneville received a double recovery.

¶ 39 Although Green River argues that the IRS considered the good will when negotiating its payout after dissolution, it provides no clear evidence of that assertion. Rather, Green River points only to the year-end balance sheet, which referenced good will, and the Amended Plan, which failed to reference good will but stated that "there is a limited market for non-cash assets of the business." These bare assertions are insufficient to establish that the trial court erred in concluding that the value of the good will had not been accounted for. *See Chang v. Soldier Summit Dev.*, 2003 UT App 415, ¶ 12, 82 P.3d 203.

¶ 40 Indeed, the trial court's conclusions regarding the accounting maneuver are brief. They state only that removing the $169,910.92 from the accounts receivable was a breach of the Agreement, and that "Bonneville is legally entitled to half of that amount ($84,955.46), which should have been distributed to Bonneville upon dissolution." These

conclusions are supported by De Waal's own testimony, during which he stated that he eliminated the account receivable and characterized that same amount as good will, an asset. Moreover, there is no evidence that good will was reflected in the Amended Plan. The Truck Stop's December 31, 1995 balance sheet, on which the Amended Plan was based, listed the following ten assets:

| | |
|---|---|
| Cash: | 231,804.35 |
| Receivables: | 213,264.21 |
| Inventory: | 212,903.79 |
| Vehicles: | 18,260.63 |
| Furniture, fixtures and equipment: | 168,829.09 |
| Leasehold Improvements: | 237,909.94 |
| Leased fuel equipment: | 37,134.00 |
| Accumulated Depreciation: | (228,500.27) |
| Good Will: | 169,910.72 |
| Deposits: | 5,596.00 |
| Total: | 1,067,112.46 |

In contrast, the Amended Plan listed only the following six assets:

| | |
|---|---|
| Cash: | 231,804.00 |
| Receivables: | 213,264.00 |
| Less reserve for doubtful accounts: | (30,000.00) |
| Inventory: | 212,910.00 |
| Vehicles: | 18,260.00 |
| Furniture, fixtures and equipment: | 42,770.00 |
| Deposits: | 5,596.00 |
| Total: | 694,604.00 |

Good will, accumulated depreciation, and leased fuel equipment were not reflected in the Amended Plan. We therefore reject Green River's contention that good will was "obviously considered in the valuation process."

¶ 41 Green River also asserts that because the trial court concluded that "the IRS negotiated respecting Bonneville's interest in the joint venture and consented to the dissolution and liquidation valuation of the joint venture assets," this contradicts the trial court's separate conclusion that good will was unaccounted for. We disagree. Although the trial court states that "the IRS negotiated respecting Bonneville's interest," we find no evidence in the record indicating that good will was discussed in these negotiations. We therefore affirm the trial court's award of accounting damages to Bonneville.

## III. Attorney Fees

█ ¶ 42 Both parties challenge the trial court's refusal to award attorney fees. "Generally, attorney fees in Utah are awarded only as a matter of right under a contract

or statute." *Foote v. Clark,* 962 P.2d 52, 54 (Utah 1998). When "[f]ees [are] provided for by contract, ... [they] are allowed only in strict accordance with the terms of the contract." *Id.* In this instance, the Agreement called for attorney fees to be paid by the defaulting party. "In the event that either party hereto shall default in the performance of their respective duties as prescribed herein, the defaulting party shall be responsible for all legal fees ... incurred in the enforcement of this agreement." The trial court, however, denied attorney fees to either party: "The Court concludes there is no prevailing party and each of the parties should accordingly bear its own costs and attorney fees." Bonneville asserts that this was error because (1) Green River defaulted on the Agreement via the accounting issue and wrongful dissolution; (2) the trial court's conclusion that Bonneville also defaulted in the Agreement was in error; and (3) the contract references a "defaulting" party and not a "prevailing" party, and thus, the trial court's analysis was incorrect.

¶ 43 Respecting Bonneville's first two claims, in so far as the trial court determined that both parties defaulted on the Agreement, its conclusions are correct. Regarding Bonneville's third claim, that there is a distinction between a defaulting party and a prevailing party, in this instance, we believe it makes no difference.

¶ 44 Bonneville's argument is largely grounded upon its assertion that the trial court erred in concluding that it had breached the Agreement. The trial court determined, and we have affirmed, that both parties defaulted by breaching the Agreement and, thus, that neither party prevailed completely. We find the trial court's approach acceptable. *See Kesler v. Elks Bldg., N.V.,* 689 P.2d 15, 21 (Utah 1984) (approving same conclusion where both parties defaulted on the agreement). Moreover, "[c]alculation of reasonable attorney fees is in the sound discretion of the trial court and will not be overturned in the absence of a showing of a clear abuse of discretion." *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988) (citation omitted). In this instance, the trial court heard evidence and oversaw the case,

then determined that because both parties defaulted, neither was entitled to fees. Because we affirm the trial court's determination that both parties defaulted, we conclude that it was within the trial court's discretion to deny attorney fees on that basis.

¶ 45 In its cross-appeal, Green River asserts that this issue should be remanded to the trial court for a determination of attorney fees using the flexible and reasoned approach described in *A.K. & R. Whipple Plumbing & Heating v. Guy,* 2004 UT 47, ¶ 7, 94 P.3d 270. Under the flexible and reasoned approach, instead of relying solely on the more rigid net judgment rule to determine the prevailing party, the court may consider the net judgment, but may also take into account "the amounts actually sought and then balanc[e that] proportionally with what was recovered." *Id.* at ¶ 26 (internal quotation marks omitted). Initially, the flexible and reasoned approach applied in cases where contracts or statutes called for attorney fees to be awarded to the " 'prevailing party.' " *Id.* at ¶¶ 14–15. However, in *Whipple,* the supreme court explained that there is essentially no distinction between a " 'successful party' " and a " 'prevailing party,' " and therefore determined that the flexible and reasoned approach applies to statutes or contracts awarding attorney fees to the prevailing party or to the successful party. *Id.* at ¶ 19.

¶ 46 Relying on *Whipple,* Green River argues that this court should remand to the trial court for application of the flexible and reasoned approach to determine which party prevailed because the trial court's attorney fee denial was based on the conclusion that there was no prevailing party. We, however, believe that the trial court acted within its authority in determining that because both parties breached the Agreement, there was no prevailing party. Moreover, the flexible and reasoned approach is based, in part, on the principle that trial courts have broad discretion in awarding attorney fees, and should use common sense when deciding whether to award them. *See id.* at ¶¶ 11, 25. Determining that both parties defaulted and, therefore, neither was entitled to attorney fees, required the trial court to apply the

discretion and common sense called for in *Whipple.* Thus, we see no reason to remand and affirm the trial court's order regarding attorney fees.[9]

## CONCLUSION

¶ 47 We affirm the trial court's conclusions that dissolution was not wrongful and that Bonneville was not entitled to damages or a share of the Truck Stop's profits through December 31, 2006. We also affirm the trial court's conclusion that Bonneville failed to establish fraud, conversion, or breach of fiduciary duty. Further, we affirm the trial court's award of damages to Bonneville based on Green River's accounting breach. And finally, because we affirm the trial court's conclusion that both parties breached the Agreement, we also affirm its conclusion that neither party is entitled to attorney fees.

¶ 48 WE CONCUR: JAMES Z. DAVIS and CAROLYN B. McHUGH, Judges.

---

**9.** Neither party contends that the trial court's findings of fact or conclusions of law regarding attorney fees are inadequate. *See J. Pochynok Co. v. Smedsrud,* 2005 UT 39, ¶ 15, 116 P.3d 353.

Given the extensive record in this case, the trial court's advantaged position, and the lack of demur by trial counsel, we do not undertake an analysis of the findings' adequacy.