**2019 UT App 80**

# THE UTAH COURT OF APPEALS

BACKBONE WORLDWIDE INC. AND BURKE HEDGES,
Appellants,
*v.*
LIFEVANTAGE CORPORATION,
Appellee.

Opinion
No. 20180038-CA
Filed May 16, 2019

Third District Court, Salt Lake Department
The Honorable Andrew H. Stone
No. 110918426

Scott O. Mercer and Ryan B. Hancey, Attorneys
for Appellants

Thomas R. Karrenberg, Richard A. Kaplan,
Jared D. Scott, and Nathan P. Hatch, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE APPLEBY concurred.

HARRIS, Judge:

¶1     LifeVantage Corporation (LifeVantage) terminated a contract it had entered into with Backbone Worldwide Inc. (Backbone). There is no dispute that LifeVantage had the technical right to terminate the contract due to certain actions Backbone had taken. But because LifeVantage did not seem bothered by Backbone's actions when they were first taken, Backbone contends that LifeVantage did not terminate the contract for those permissible reasons, but instead claims that LifeVantage terminated the contract simply because it did not want to pay, and because of animosity toward Backbone's

owner, Burke Hedges. Backbone contends that LifeVantage's termination of the contract under these circumstances was improper and a violation of the implied covenant of good faith and fair dealing. The district court was not persuaded by Backbone's arguments, and entered summary judgment in favor of LifeVantage, not only on Backbone's contract claim, but also on LifeVantage's separate counterclaim for conversion. We affirm the district court's entry of summary judgment in LifeVantage's favor.

## BACKGROUND

¶2 In 2009, LifeVantage—already an existing, publicly-traded company—relaunched itself as a multi-level marketing company to promote sales of a nutritional supplement. As part of these efforts, LifeVantage sought the help of Hedges and his company, Backbone. Hedges was well-known within the multi-level marketing industry as an author and speaker. In May 2009, LifeVantage and Backbone entered into an agreement whereby Backbone would become a LifeVantage distributor and undertake additional duties to promote LifeVantage. To this end, Hedges, for and on behalf of Backbone, signed LifeVantage's standard Independent Distributor Agreement, which incorporated LifeVantage's Policies and Procedures; the parties also agreed to and executed a written amendment of that agreement (First Amendment) outlining Backbone's additional duties and compensation. The standard Independent Distributor Agreement, along with the First Amendment and the incorporated Policies and Procedures, constitute the full agreement between the parties, and are collectively referred to herein as "the Agreement."

¶3 Under the terms of the Agreement, LifeVantage agreed to make "Support Payments" to Backbone in the amount of $20,000 per month for the first three months of the Agreement, then

$10,000 per month for the next nine months or until the "cancellation of the Agreement for any reason in accordance with the Agreement." LifeVantage also agreed to compensate Backbone as a distributor, through commissions and various bonuses, at the highest level allowed by LifeVantage's compensation plan, regardless of whether Backbone actually qualified for that level through the usual measurements.

¶4 The Agreement defined "Cancellation" as "the expiration or termination of an Independent Distributor's Business. Cancellation may be either voluntary or involuntary by either LifeVantage or an Independent Distributor, through non-renewal, inactivity or breach of the Agreement." "Breach" was defined as "an actual or alleged transgression or violation of any part of this Agreement." The Agreement addressed remedies for breach and stated that "[a]ny breach of the Agreement . . . may result, at LifeVantage's discretion, in . . . [c]ancellation of the [Agreement]."

¶5 While the Agreement required Backbone to "develop sales aides" for LifeVantage, it also required that "supplemental marketing material of any kind, . . . be submitted to [LifeVantage's] Compliance Department for approval before it can be used or made public." Moreover, the Agreement contained several restrictions on distributors' ability to develop websites to promote LifeVantage products, and required distributors to register any such websites with LifeVantage and receive written approval from LifeVantage before making any such site publicly available.

¶6 In June 2009—only weeks after entering into the Agreement—Backbone developed and made public a website (the Website) that it used for various purposes, including the promotion of LifeVantage products. Backbone, through Hedges, also pitched the Website to others in the LifeVantage network as a way for them to likewise market their LifeVantage business.

On the Website, Backbone also made health-related claims about LifeVantage products and income-related claims about working for LifeVantage, two actions that were expressly prohibited by the Agreement. Backbone further used the Website to sell not only LifeVantage products but also non-LifeVantage products, another activity prohibited by the Agreement. LifeVantage never provided Backbone with written approval for any marketing material, including the Website.

¶7　By October 2009, LifeVantage had developed cash flow problems, and it stopped paying Backbone the Support Payments required by the Agreement. LifeVantage proposed another amendment to the Agreement (Second Amendment) under which Backbone would agree to accept LifeVantage stock in lieu of the cash Support Payments. In anticipation that Backbone would agree to the Second Amendment, LifeVantage instructed its stock transfer agent (Transfer Agent) to issue a certificate for 240,000 shares of stock in Hedges's name, to be sent to LifeVantage. However, Backbone never agreed to the Second Amendment, and therefore LifeVantage maintained possession of the certificate and did not present it to Hedges.

¶8　In February 2010, LifeVantage emailed Backbone regarding the Website, and for the first time took the position that the Website should not have gone live without LifeVantage's prior approval, was not in compliance with the Agreement, and needed to be brought into compliance immediately. Shortly thereafter, LifeVantage began looking into other alleged misconduct by Backbone and Hedges. LifeVantage had received complaints about Hedges's personal behavior; these complaints ranged from Hedges "not [being] a team player," to Hedges stealing the business of other LifeVantage distributors, all the way to sexual harassment. In May 2010, LifeVantage sent Backbone a letter restating its concerns with the Website, and stating that it had received complaints from other

members of its organization about Hedges's conduct. Hedges denied the allegations of personal misconduct.

¶9 After conducting an investigation, LifeVantage determined that at least some of the complaints of personal misconduct against Hedges were credible, and that Backbone had committed various breaches of the Agreement. At this point, in June 2010, LifeVantage terminated the First Amendment to the Agreement and placed Backbone on "probation." After that, however, LifeVantage continued to receive complaints about Hedges's personal behavior, and it "suspended" Backbone's distributorship in July 2010. Less than a month later, LifeVantage terminated the Agreement entirely.

¶10 In July 2010, while LifeVantage was investigating and taking action against Backbone, Transfer Agent—apparently as a routine matter, without being specifically asked to do so by LifeVantage—sent Hedges a statement showing that he had been issued a certificate for 240,000 shares of LifeVantage stock. In early 2011, Hedges called Transfer Agent, and explained that he had never received a stock certificate for the shares. Transfer Agent asked Hedges to fill out some additional paperwork, including an affidavit attesting that he had never received a stock certificate, and Hedges complied. Transfer Agent acknowledged Hedges's non-receipt of the stock certificate in a letter dated March 9, 2011, and then issued Hedges a substitute stock certificate for the 240,000 shares. Transfer Agent did not inform LifeVantage about the new stock certificate issued to Hedges. Soon after receiving the certificate, Hedges proceeded to transfer all of his shares to his wife, who later sold the shares to a third party for approximately $380,000.

¶11 Backbone filed suit against LifeVantage in October 2011 asserting, among other claims, breach of contract and breach of

the covenant of good faith and fair dealing.[1] Its chief complaint was that LifeVantage had failed to pay all of the Support Payments due under the Agreement. Backbone would later file two amended complaints, each of which contained a general breach of contract claim but omitted any separate claim for breach of the covenant of good faith and fair dealing. For its part, LifeVantage denied any wrongdoing. In March 2014, LifeVantage learned, through Backbone's counsel, that Hedges had acquired a substitute stock certificate and thereby had obtained the 240,000 shares of LifeVantage stock, and LifeVantage responded by filing counterclaims for conversion, fraud, and securities fraud against Hedges personally.[2]

¶12 Backbone's second amended complaint, filed in May 2015, stated that Backbone never agreed to amend the Agreement to

---

1. Backbone listed Hedges as a co-plaintiff in its initial complaint and in each subsequent amended complaint, but it did not then offer (and does not now offer) any explanation as to how Hedges could have been individually injured—other than in his capacity as Backbone's owner—by LifeVantage's failure to pay the Support Payments. For the purposes of this opinion, we view the breach of contract claims against LifeVantage as having been pleaded only by Backbone.

2. LifeVantage nominally pleaded these counterclaims against Backbone and against Hedges personally. The counterclaim included an assertion that Backbone was the alter ego of Hedges, but the district court never resolved that claim. Absent its argument for alter ego, LifeVantage offered no explanation in its counterclaim—and offers none here—as to how Backbone can be liable for conversion of the 240,000 shares of stock. For the purposes of this opinion, we view the conversion counterclaim as having been pleaded only against Hedges personally.

allow LifeVantage to compensate it in stock instead of cash. Though it acknowledged that Hedges received the substitute stock certificate, and that the stock would have been given as compensation for the amount due Backbone under the original Agreement, it still claimed Backbone was damaged in the full amount of unpaid Support Payments.

¶13    LifeVantage and Backbone each filed cross-motions for summary judgment on all relevant issues. The district court initially granted summary judgment in favor of LifeVantage on its conversion counterclaim against Hedges, but denied summary judgment on LifeVantage's counterclaims for fraud and securities fraud, as well as on Backbone's breach of contract claims. LifeVantage asked the court to reconsider its summary judgment ruling, and after additional briefing and argument, the court entered an order granting summary judgment in favor of LifeVantage on Backbone's breach of contract claims. The court determined that Backbone breached the contract by rolling out the Website without prior written approval, that this breach gave LifeVantage the contractual right to terminate, and that LifeVantage was not prohibited from terminating under Utah's first breach rule. The parties then settled the remaining issues and the district court entered an order and judgment dismissing them with prejudice.

## ISSUES AND STANDARD OF REVIEW

¶14    Backbone and Hedges now appeal the district court's summary judgment orders, and ask us to review two issues.[3]

---

3. In their opening brief, Backbone and Hedges stated that they were raising seven issues on appeal. But many of these issues are sub-issues of the two issues we describe. For instance, Backbone's claim that the court erred in calculating its damages

(continued…)

First, Backbone argues that the district court erred by granting summary judgment in LifeVantage's favor on Backbone's breach of contract claims against LifeVantage. Second, Hedges argues that the district court erred by granting summary judgment in LifeVantage's favor on its conversion counterclaim. "We review a grant of summary judgment for correctness, granting no deference to the district court's legal conclusions." *Salt Lake City Mission v. Salt Lake City*, 2008 UT 31, ¶ 5, 184 P.3d 599. A district court may properly enter summary judgment "'if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Salo v. Tyler*, 2018 UT 7, ¶ 29, 417 P.3d 581 (quoting Utah R. Civ. P. 56(a)). In reviewing the record in connection with a summary judgment motion, a court must view "all facts and the reasonable inferences to be made therefrom . . . in a light favorable to the non-moving party." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 33, 235 P.3d 749.

ANALYSIS

A

¶15    Backbone argues that LifeVantage violated the implied covenant of good faith and fair dealing when it terminated the Agreement, because it views the reasons LifeVantage offered for the termination as pretextual and offered in bad faith. In

---

(…continued)

under the Agreement, by its own admission, "is erroneous for the same reasons [the court's] termination decision is erroneous." Another issue raised by Backbone—whether a statement made in passing by the district court was correct—is inconsequential, because it was hypothetical and had no bearing on the outcome of the case.

addition, Backbone asserts that LifeVantage breached the contract first, and argues that the first breach rule prevented LifeVantage from terminating the Agreement. Assuming, without deciding, that Backbone pleaded a breach of implied covenant claim,[4] we conclude that the district court did not err in determining that LifeVantage legally terminated the Agreement.

1

¶16    "The implied covenant of good faith and fair dealing (the covenant) inheres in every contract." *Markham v. Bradley*, 2007 UT App 379, ¶ 18, 173 P.3d 865. The covenant prohibits the parties from intentionally "injur[ing] the other party's right to receive the benefits of the contract," and "prevent[s] either party from impeding the other's performance of his obligations" by "render[ing] it difficult or impossible for the other to continue

---

4. LifeVantage asserts that Backbone waived any claim for breach of the implied covenant when it filed an amended complaint that—unlike its original complaint—did not contain a separately pleaded cause of action for breach of the implied covenant, though it did contain a general cause of action for breach of contract. It is certainly true that lawyers often plead a claim for breach of the implied covenant separately, but we wonder whether this is simply a matter of custom, or whether there is some legal reason the claim must be pleaded separately. After all, the implied covenant is simply a term of the contract like any other, *see generally Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193 ("A violation of the covenant is a breach of the contract."), and no one would contend that separately pleaded causes of action for breach of each separate contractual provision at issue are necessary. In any event, we need not further concern ourselves with this question here, because even assuming that Backbone properly pleaded a claim for breach of the implied covenant, that claim fails on its merits.

performance." *Id.* (quotation simplified). But the covenant "cannot create rights and duties inconsistent with express contractual terms," *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226; *see also Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 10 n.4, 266 P.3d 814 (same), and it "cannot compel a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party," *Markham*, 2007 UT App 379, ¶ 19 (quotation simplified).

¶17    "[T]he degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and imposed limitations on the exercise of discretion through express contract terms." *Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 20, 84 P.3d 1154. The covenant has an important role to play when the terms of the contract leave the very existence of the right to terminate it in the sole and undefined discretion of one party. In such situations, the covenant requires that the party possessing such discretion exercise it in a good faith, objectively reasonable manner. *See Markham*, 2007 UT App 379, ¶ 21 ("Where the contract allows discretion but does not provide any express standard for exercising that discretion, the covenant imposes an objective standard of reasonableness."). These situations necessarily involve contracts that do not impose definitional limits on the party's exercise of discretion, and therefore implying "good faith" or "reasonableness" requirements through the covenant is not at all inconsistent with any express contractual terms.

¶18    Two examples, from cases relied upon by Backbone, are illustrative. In *Powderham v. Synergy Worldwide, Inc.*, No. 2:08-CV-548 CW, 2010 WL 988494 (D. Utah Mar. 12, 2010), the parties' contract provided that the defendant could terminate the contract if at any time it was "dissatisfied" with the plaintiff's performance, but it provided no criteria for objectively determining whether the defendant was truly "dissatisfied." *Id.*

at *1. And in *Markham*, the parties' contract permitted the defendant to terminate it if the content of a credit report was "not acceptable" to the defendant, but provided no guidance for determining what ought to be "acceptable." 2007 UT App 379, ¶ 22.[5] In each of these situations, because the ability of one party

---

5. Two other cases may also fall into this category, although they discuss discretionary contractual rights other than termination. *See Cook Assocs., Inc. v. Utah School & Institutional Trust Lands Admin.*, 2010 UT App 284, 243 P.3d 888; *Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445 (Utah Ct. App. 1994). In *Cook Associates*, the parties' land lease provided that defendant had the "discretion to adjust the rental rate" as it deemed "reasonably necessary," but the lease gave no other guidance as to how much the defendant could raise the rent. 2010 UT App 284, ¶ 2 (quotation simplified). And in *Olympus Hills*, the grocery store tenant had the right to occupy the leased premises with another "lawful retail selling business," but the lease provided no additional guidance as to what kind of retail business it could operate there. 889 P.2d at 449 (quotation simplified). In both cases, the implied covenant was deemed to supply an objective reasonableness standard, drawn from the parties' course of dealing and from the parties' "justified expectations" surrounding the contract, that cabined the party's ability to unilaterally expand the scope of the relevant contractual right. *See Cook Assocs.*, 2010 UT App 284, ¶ 29; *Olympus Hills*, 889 P.2d at 451. In this case, by contrast, neither party had any subjective discretion in determining whether LifeVantage had the right to terminate; moreover, LifeVantage's decision to exercise its right to terminate the Agreement in the wake of Backbone's breach did not unsettle anyone's "justified expectations" or deprive anyone of the "reasonably expected benefit[s] of the bargain," *see Olympus Hills*, 889 P.2d at 450–51, because the parties' bargain specifically included affording

(continued…)

to terminate the contract was left entirely up to that party's undefined discretion, the courts held that the implied covenant operated to supply an objective reasonableness standard by which the party's discretion must be exercised. *See Powderham*, 2010 WL 988494, at *6; *Markham*, 2007 UT App 379, ¶ 21; *see also Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985) (stating that "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract").

¶19    The situation is different, however, when a party's right to terminate a contract is not a matter of one-sided, undefined discretion but, instead, is established pursuant to objective criteria. For example, in many contracts the right to terminate is conditioned on the happening of an objectively defined event. *See, e.g.*, *Load Zone Mktg. & Mgmt., LLC v. Clark*, 2014 UT App 194, 333 P.3d 1255 (discussing a contract in which each side had the right to terminate if the buyer failed to procure a loan by a certain date). In such situations, the contract by its terms gives a party the express right to terminate the contract upon objectively defined criteria; no discretion is contemplated or exercised in arriving at that decision. When this occurs, the implied covenant does not intervene to impose an objective reasonableness standard on the party's ability to terminate, because the express terms of the contract already objectively afford the party that right, and the implied covenant cannot operate to vary express contractual rights.

¶20    *Load Zone*, relied upon by LifeVantage, is illustrative. There, the contract allowed either side the option to terminate it if the defendant "was unable to secure a loan" by a set deadline.

---

(…continued)
LifeVantage the option to cancel the Agreement if Backbone committed "any breach" of the Agreement's terms.

*Id.* ¶ 2. That deadline passed without the defendant being able to secure a loan, giving either side the right to terminate, and the defendant elected to exercise that right and terminate the contract. *Id.* ¶ 3. The plaintiff sued, arguing that the defendant had not terminated the contract because he had been unable to secure a loan; the plaintiff contended—and the defendant acknowledged—that the defendant chose to terminate for other unrelated economic reasons. *Id.* ¶ 5. This court, in ruling in favor of the defendant, cited federal authorities holding that, "as a general rule, 'if a party has a legal right to terminate a contract, its motive for exercising that right is irrelevant.'" *Id.* ¶ 17 (quotation simplified) (quoting *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000)). Because the contract clearly provided that the defendant had the right to terminate, and did not leave the existence of a termination right up to one party's discretion, the defendant could exercise that express contractual right regardless of its motives.

¶21   This case falls into the second category of cases, because LifeVantage had the express and objectively determined right to terminate the Agreement due to Backbone's undisputed breaches. LifeVantage's right to terminate did not depend upon purely subjective circumstances, such as LifeVantage being "dissatisfied" or upon deliverables being "unacceptable." *E.g.*, *Powderham*, 2010 WL 988494, at *6; *Markham*, 2007 UT App 379, ¶ 21. Instead, the Agreement prohibited Backbone from disseminating any unapproved marketing materials, and Backbone had (among other things) already launched the unapproved Website by the summer of 2009. Given those facts, the Agreement gave LifeVantage the right to cancel for any breach, no matter how slight, and therefore it is undisputed that LifeVantage had the objective right to terminate the Agreement.

¶22   Backbone argues, however, that LifeVantage had ulterior motives for terminating the Agreement that were unrelated to Backbone's breaches. Backbone correctly points out that

LifeVantage did not express its displeasure with the Website until February 2010, more than six months after it had gone public, and several months after it became clear that LifeVantage was unable to pay Backbone the Support Payments that were owed. But these facts are materially indistinguishable from the facts of *Load Zone*, and that case controls the outcome here. LifeVantage had the objective and undisputed right to terminate the Agreement, and where "a party has a legal right to terminate a contract, its motive for exercising that right is irrelevant." *Load Zone*, 2014 UT App 194, ¶ 17 (quotation simplified).

¶23    Backbone attempts to distinguish *Load Zone* on the ground that, in *Load Zone*, this court made no mention of the implied covenant of good faith and fair dealing in its analysis. Although the court's analysis in *Load Zone* did not expressly discuss the implied covenant, the cases cited in *Load Zone* do. For instance, the Seventh Circuit stated plainly that parties do not have the right to complain "about a pretextual termination" where there is "good cause for termination," and clarified that "the fact that there is a duty of good faith read into every contract does not justify judicial inquiry into motive." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000) (cited with approval in *Load Zone*, 2014 UT App 194, ¶ 17); *see also Milford-Bennington R.R. Co. v. Pan Am Rys.*, 695 F.3d 175, 180–81 (1st Cir. 2012) (holding, in the face of a claim for breach of the implied covenant, that where a party has "an unassailably valid reason" to exercise a contractual right, "its alleged ulterior motives are irrelevant") (also cited with approval in *Load Zone*, 2014 UT App 194, ¶ 17).

¶24    LifeVantage had an objectively clear right to terminate the Agreement any time after June 2009, when Backbone first went live with the Website without getting approval as required under the Agreement. LifeVantage waited several months before electing to exercise that right, a turn of events to which Backbone ascribes illicit motive but which, in reality, is not all that

unusual. Sometimes, parties who possess even a clear and objectively determined right to terminate a contract may nevertheless choose to remain in a contractual relationship; by the same token, parties may sometimes elect to exercise their right to terminate even though the contractual relationship could perhaps be salvaged.[6] But as long as the party has an express and objectively determined right to terminate, and absent the elements of legal waiver being met, *see, e.g.*, *Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 17, 422 P.3d 809, that party may exercise that right, and its motives for doing so are irrelevant, despite the existence of the implied covenant, *see Load Zone*, 2014 UT App 194, ¶ 17. To hold

---

6. The parties' decision to use the word "discretion" in the section of the Agreement setting forth LifeVantage's range of remedies in the event of Backbone's breach does not change the analysis. In this case, the Agreement expressly provided LifeVantage with the option, in the event of Backbone's breach, to select—at its "discretion"—any one of several remedies, including "[c]ancellation" of the Agreement. There is no need for implication of an objective reasonableness standard here, because the Agreement gives LifeVantage a clearly defined and limited right. *See Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 20, 84 P.3d 1154 (stating that "the degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and imposed limitations on the exercise of discretion through express contract terms"). Indeed, even if the only options LifeVantage had in the event of Backbone's breach were to choose to terminate or elect not to, the analysis would not be different; parties generally have discretion to waive or postpone the exercise of an objectively determined right to terminate, and the implied covenant does not justify an inquiry into a party's motive for exercising (or not exercising) that right.

otherwise would allow the covenant to displace or vary express contractual rights, something our cases forbid. *See, e.g., Oakwood*, 2004 UT 101, ¶ 45. Accordingly, the implied covenant is no bar in this case to LifeVantage's lawful exercise of its right to terminate the Agreement.

2

¶25 Backbone next argues that LifeVantage was not permitted to terminate the Agreement because LifeVantage materially breached the Agreement first, and therefore, termination was in violation of Utah's first breach rule. Pursuant to that rule, "a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform." *Bonneville Distrib. Co. v. Green River Dev. Assocs., Inc.*, 2007 UT App 175, ¶ 32, 164 P.3d 433 (quotation simplified). The first breaching party "can neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform." *Id.* (quotation simplified).

¶26 Backbone is not a candidate for invocation of the first breach rule because, in this case, it is undisputed that Backbone was the first party to breach the Agreement. Backbone first rolled out the Website in June 2009, while LifeVantage did not stop paying Backbone until October 2009. Since the first breach rule—even if it otherwise applied here on these facts, something we stop short of deciding[7]—could only aid Backbone if LifeVantage breached first, *see id.*, it does not apply here.[8]

---

7. LifeVantage argues that there exists another ground upon which the first breach rule is inapplicable in this case, and the district court's ruling espoused this alternative argument. We do not need to reach the merits of this alternative argument,

(continued…)

¶27 Because neither the implied covenant nor the first breach rule imposed a legal bar to LifeVantage's termination of the Agreement, we conclude that the district court did not err in entering summary judgment in favor of LifeVantage on Backbone's claims for breach of contract and for breach of the implied covenant of good faith and fair dealing.

B

¶28 Finally, Hedges argues that the district court erred by granting summary judgment in favor of LifeVantage on the issue of conversion. Specifically, Hedges asserts that the court erred by not drawing what he deems a reasonable inference in his favor, namely, that LifeVantage "changed its mind" about the Second Amendment and intentionally gave Hedges the stock in lieu of the Support Payments it owed, despite his refusal to sign the Second Amendment. We are not persuaded.

¶29 To prevail on appeal, an appellant "must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8); *see also Andersen v. Andersen*, 2015 UT App 260, ¶ 6, 361 P.3d 698 (discussing appellant's burden on appeal). Hedges devotes less than two pages of his opening brief to this

---

(…continued)
because of our determination that Backbone cannot avail itself of the first breach rule given that it is the party that breached first.

8. Backbone also argues that its breaches involving the Website were not "material" breaches sufficient to be considered the "first" breach. We find this argument unconvincing, because the Agreement expressly states that "any breach" is sufficient to trigger the right to terminate, and is therefore material under the terms of the Agreement.

topic, and his arguments fail to persuade us because they lack the "reasoned analysis supported by citations to legal authority and the record" crucial to satisfying the burden. *See* Utah R. App. P. 24(a)(8). Hedges cites only one case—*Poteet v. White*, 2006 UT 63, 147 P.3d 439—in his conversion analysis, a case that supports his argument that, as a nonmovant, he is entitled to have reasonable inferences drawn in his favor. But no conversion claim was at issue in *Poteet*, and Hedges does not provide this court with so much as a list of the elements of conversion, much less a reasoned analysis of how any reasonable inference in his favor would defeat summary judgment on any of the elements of a conversion claim.

¶30 Hedges's citations to the factual record are similarly bereft of substance. In his opening brief, Hedges cites only to the district court's decision on the issue of conversion and his own pleadings. In his reply brief, he adds only two citations to the record, one to his own deposition testimony and one to an account statement from Transfer Agent evidencing the fact that a stock certificate was issued. None of this evidence provides a foundation for inferring LifeVantage's intent, if any, in issuing a stock certificate in Hedges's name. Although a nonmoving party is "entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 7, 264 P.3d 752 (quotation simplified). The scant evidence Hedges cites leaves us only to "theoriz[e] about matters over which there is no certain knowledge." *See Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 22, 390 P.3d 314 (quotation simplified).

¶31 Because Hedges does not supply us with an evidentiary foundation from which to draw a relevant inference in his favor, nor the legal framework under which to analyze the implications of that inference, he fails to carry his burden of demonstrating that the court committed error in entering summary judgment in LifeVantage's favor on its counterclaim for conversion.

CONCLUSION

¶32    Because LifeVantage terminated its contract with Backbone only after Backbone committed objective, defined, and undisputed breaches, the district court was correct to not question its motives for doing so. And because Backbone committed some of those undisputed breaches before LifeVantage ceased making the Support Payments, Backbone cannot avail itself of the first breach rule. The court therefore did not err in granting summary judgment in favor of LifeVantage on Backbone's claims for breach of contract, including any claim for breach of the implied covenant of good faith and fair dealing. And Hedges has not carried his burden of persuading us that the district court erred in granting summary judgment in favor of LifeVantage on the conversion counterclaim.

¶33    Affirmed.

———————