2002 UT 14

U.S. REALTY 86 ASSOCIATES, a New Jersey general partnership, Plaintiff and Appellant,

v.

SECURITY INVESTMENT, LTD., a Utah limited partnership; William K. Olson, an individual, and Barbara L. Olson, an individual, Defendants and Appellees.

No. 20000450.

Supreme Court of Utah.

Jan. 25, 2002.

John L. Young, Jeremy M. Hoffman, Brent O. Hatch, Salt Lake City, and Sheppard A. Guryan, Bruce A. Snyder, Roseland, NJ, for plaintiff.

George K. Fadel, Bountiful, for defendants.

## INTRODUCTION

HOWE, Chief Justice.

¶ 1 Plaintiff U.S. Realty 86 Associates ("U.S.Realty") failed to timely exercise options to renew two commercial leases between itself and defendants Security Investment, Ltd., William L. Olson, and Barbara L. Olson (collectively "Security Investment"). U.S. Realty subsequently brought this action against Security Investment seeking a declaratory judgment that U.S. Realty was equitably excused from strict compliance with the renewal provisions of the leases, and that Security Investment had waived its right to receive timely notice under the leases. The trial court ruled in favor of Security Investment on both issues. U.S. Realty now appeals.

## BACKGROUND

¶ 2 The two ground leases at issue concern land in Woods Cross, Utah, on which a commercial shopping complex known as the Woods Cross K–Mart Center now sits. Both leases commenced on August 1, 1973. Defendant Security Investment was the original lessor under one of the leases; defendant William L. Olson was the original lessor under the other. Plaintiff U.S. Realty, a New Jersey general partnership in the business of managing shopping centers, acquired by assignment the rights as lessee under the leases on October 15, 1986.

¶ 3 Upon acquisition of its rights as lessee, U.S. Realty was entitled to the remainder of the leases' initial twenty-five-year terms. Additionally, the leases gave U.S. Realty options to renew for six consecutive five-year terms. To exercise the first option, the leases required U.S. Realty to notify Security Investment in writing of its intent by March 3, 1998, which was 150 days prior to the expiration of the initial lease terms.

¶ 4 Between 1986 and 1995, U.S. Realty employed a number of agents to manage its holdings, including the K–Mart Center property. In October 1995, U.S. Realty switched agents from the Winding Brook Company to the Garden Homes Group.[1] In conjunction with the transfer, attorney Mark Hoffman, Garden Homes' principal asset manager, obtained from Winding Brook all documents necessary for the management of the K–Mart Center, including copies of the leases, the lease abstracts prepared by Winding Brook, the tenant leases, and the maintenance files.

¶ 5 Hoffman assigned Phil Shiffman, an accountant employed by Garden Homes, to enter information contained in the newly acquired documents into U.S. Realty's computer system. In completing this task, Shiffman consulted only the lease abstracts prepared by Winding Brook Company and not the leases themselves. Shiffman also entered the important dates contained in the abstracts into a personal diary he used to remind himself of significant events regarding the leases. Thereafter, Hoffman relied on Shiffman to notify him of the important dates requiring action by U.S. Realty.

¶ 6 In 1996, the Utah Department of Transportation ("UDOT") notified U.S. Realty and Security Investment of its intent to condemn a part of the K Mart Center property for the construction of an access road to an adjacent highway. Upon learning of UDOT's plans, Hoffman reviewed the leases to determine U.S. Realty's rights upon condemnation. He concluded that according to the leases, U.S. Realty had a right to participate in a severance damage award and was

---

[1]. Jacob Byrstyn, Winding Brook's principal asset manager, was also a general partner in U.S. Realty.

entitled to future pro rata reductions in rent. Condemnation actions were filed in March 1997 and April 1998. U.S. Realty, Security Investment, and UDOT orally entered into a condemnation settlement agreement. The parties agreed that Security Investment would reduce U.S. Realty's rent in exchange for U.S. Realty's release of its claims in the condemnation proceedings.

¶ 7 On April 17, 1998, Hoffman reviewed the leases in order to calculate the reduction in rent that U.S. Realty would receive according to the parties' agreement. Upon examination, he discovered that U.S. Realty had failed to exercise the renewal options within the prescribed renewal period. Hoffman immediately contacted Shiffman, and Shiffman discovered that he did not have the option renewal dates in his personal diary. Hoffman then sent notices to Security Investment of U.S. Realty's intent to exercise the options. Security Investment received the notices on April 22, 1998, and placed them in a file without reading them. Ultimately, U.S. Realty's notices were over forty-five days late.

¶ 8 Between April 22, 1998, and July 15, 1998, the parties continued to carry on business as normal. Security Investment contacted U.S. Realty and requested that U.S. Realty pay for a sewer assessment and slope easement through December 1, 1998, approximately five months into the first renewal term of the lease. The parties also continued to discuss the condemnation action settlement, and Security Investment's attorney requested that Hoffman prepare paperwork to reflect the future rent reductions agreed upon by the parties.

¶ 9 On July 15, 1998, Security Investment found and read U.S. Realty's untimely notice of its intent to exercise the options. It subsequently informed U.S. Realty that it deemed the exercise of the options untimely and declared the leases terminated as of July 31, 1998. Despite Security Investment's declaration, on July 20, 1998, U.S. Realty tendered the full ground rent for the first year of the renewal period to Security Investment, which Security Investment rejected.

¶ 10 U.S. Realty brought this action seeking equitable relief in the form of a declaratory judgment that its interest in the K–Mart Center property had not been forfeited as a result of the delayed notices. It further sought a declaratory judgment that Security Investment had waived its right to receive timely notice under the leases. The trial court ruled against U.S. Realty on both issues. U.S. Realty now appeals, contending that the trial court erred as a matter of law by refusing to equitably excuse it from strict compliance and by finding that Security Investment had not waived strict compliance with the notice provisions of the leases.

## STANDARD OF REVIEW

¶ 11 The issues of equitable excuse and waiver are mixed questions of fact and law; therefore, we grant broadened discretion to the findings of the trial court. *See State v. Pena*, 869 P.2d 932, 938 (1994); *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 938 (Utah 1993).

## ANALYSIS

I.

¶ 12 The trial court found that U.S. Realty's untimely exercise of the options resulted from its wilful and gross negligence and, as a result, it did not merit equitable excuse. The court reasoned that because U.S. Realty's employees were professionals, U.S. Realty needed to demonstrate a higher duty of care in the management of its leases than would otherwise be required of an ordinary lessee. U.S. Realty's failure to read the leases until forty-five days after the option deadlines did not, according to the trial court, meet this higher duty of care, and thus constituted wilful and gross negligence. U.S. Realty urges us to reverse the judgment of the trial court, arguing that the court erred in applying a higher standard of care to its management of the leases, and that it qualifies for equitable relief under the correct legal standard.

¶ 13 We begin our analysis by referring to our recent decision in *Utah Coal & Lumber Restaurant, Inc. v. Outdoor Endeavors Unlimited*, 2001 UT 100, 40 P.3d 581, where we detailed the circumstances in

which an untimely renewal of a lease option may be equitably excused. In *Utah Coal,* we stated that "the failure to strictly comply with a lease's option renewal terms may be equitably excused only when the failure is caused by instances of fraud, misrepresentation, duress, undue influence, mistake, or the lessor's waiver of its right to receive notice." *Id.* at ¶ 10, 40 P.3d. 583. In line with previously established principles of equitable relief, we also stated that "equity should not be applied in situations where negligence, inadvertence or neglect caused the failure to exercise a lease renewal option." *Id.* at ¶ 14, 40 P.3d 584. In so holding, *Utah Coal* expressly rejected the balancing test first applied in *F.B. Fountain Co. v. Stein,* 97 Conn. 619, 118 A. 47 (1922). *Id.* at ¶ 16, 40 P.3d 584. Thus, *Utah Coal* makes it clear that courts do not need to inquire into, nor do we need to address, the level of negligence that may contribute to a lessee's failure to timely exercise its option. Negligence, regardless of the type, may not, by itself, serve as grounds for equitable relief.

## II.

¶ 14 In accordance with *Utah Coal,* in order to merit equitable relief, U.S. Realty must show that its untimely exercise was due to fraud, misrepresentation, duress, undue influence, mistake, or waiver. U.S. Realty relies only on waiver and mistake.[2] We address each ground in turn.

¶ 15 U.S. Realty argues that Security Investment waived its right to receive timely notice. However, the trial court ruled that no waiver had occurred because U.S. Realty had failed to prove that Security Investment knew of its right to receive notice of renewal by March 3, 1998, and intended to waive that right. U.S. Realty contends that the trial court should have implied Security Investment's intent to waive timely notice from (1) its failure to demand strict compliance with the leases until fourteen days before they expired; (2) its willingness to negotiate regarding the condemnation settlement following the expiration of the option deadlines; and (3) its demand for payment of sewer expenses which would extend into the new lease terms. U.S. Realty also asserts that the trial court should have found that Security Investment had constructive knowledge of the notice requirements and of its right to waive strict compliance therewith.

¶ 16 We disagree. The legal standard necessary to find waiver is clear: " '[W]aiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it.' " *Soter's, Inc. v. Deseret Fed. Savs. & Loan Ass'n,* 857 P.2d 935, 942 (Utah 1993) (quoting *Phoenix, Ins. v. Heath,* 90 Utah 187, 194, 61 P.2d 308, 311–12 (1936)). We have stated that courts must be "especially careful in their examination of the evidence in questions of waiver and option performances, especially where such waiver is merely implied." *Geisdorf v. Doughty,* 972 P.2d 67, 72 (Utah 1998). Specifically, courts should exhibit caution "in finding implied waiver on the part of an optionor unless the totality of the circumstances demonstrates an unambiguous intent to waive the strict compliance required to exercise an option." *Id.* The events that U.S. Realty points to here do not under the totality of the circumstances demonstrate an unambiguous intent to waive strict compliance with the notice of renewal provisions of the leases. Neither Security Investment's continued negotiation with U.S. Realty nor its demand for payment of the sewer expenses nor its failure to insist on strict compliance until two weeks prior to the leases' expiration dates compels a distinct inference of an intent to waive timely written notice; a number of possible conclusions can be drawn from each instance. *See Geisdorf,* 972 P.2d at 74. For example, as the trial court pointed out, Security Investment's discussion of the condemnation proceedings, aside from being seen as an implied waiver, could be viewed merely as a continued effort to settle

2. Both at trial and on appeal, U.S. Realty raised the issue of waiver separately from the issue of equitable excuse. *Utah Coal,* however, includes waiver in its list of circumstances that qualify a lessee's untimely exercise for equitable excuse, and, accordingly, we address it in our discussion of U.S. Realty's grounds for equitable excuse.

a long-time dispute. Likewise, Security Investment's failure to insist on strict compliance until two weeks prior to the leases' terms expiration does not necessarily demonstrate its intent to waive notice; it could actually bespeak Security Investment's intent to require timely notice. Therefore, cognizant of the broadened discretion we give to the trial court on issues of waiver, we affirm the trial court's refusal to imply waiver in these circumstances. *See State v. Pena,* 869 P.2d 932, 938 (Utah 1994); *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935 (Utah 1993).[3]

¶ 17 Having decided that Security Investment did not waive its right to receive timely notice, we turn to U.S. Realty's contentions regarding mistake. It characterizes both its failure to exercise the options in a timely manner and its failure to properly record the leases' option periods in its computer system and diary as mistakes. Were U.S. Realty's actions mistakes, under our holding in *Utah Coal,* U.S. Realty could merit equitable excuse. As we noted in *Utah Coal,* however,

> in equity a mistake cannot be based on a negligent act or omission. Indeed,
>
>> [a] mistake within the meaning of equity is a non-negligent but erroneous mental condition, conception, or conviction induced by ignorance, misapprehension, or misunderstanding, resulting in some act or omission done or suffered by one or both parties, without its erroneous character being intended or known at the time.
>
> 27A Am.Jur.2d *Equity* § 7 (1996). We acknowledged this principle over seventy years ago in *Provo Reservoir Co. v. Tanner,* 28 [68] Utah 21, 25–26, 249 P. 118, 119 (1926), when we wrote: 'No one can predicate a mistake on his own negligent omission to perform a legal duty . . . .'

*Utah Coal,* 2001 UT 100 at ¶ 11, 40 P.3d 583. Accordingly, because the trial court found that U.S. Realty's mismanagement of the leases and untimely exercise of the options

were negligent, they cannot be considered mistakes and do not warrant equitable relief.

### III.

¶ 18 Our analysis shows that the trial court correctly determined that U.S. Realty did not merit equitable excuse because U.S. Realty has not shown that its untimely exercises of the options were caused by fraud, misrepresentation, duress, undue influence, or mistake, or that there was waiver. Indeed, U.S. Realty's failure to timely exercise its options stems solely from its own negligence. At his deposition, Hoffman testified that he and Shiffman did not read the K Mart Center leases until forty-five days after the option periods had expired. Hoffman further testified that Shiffman's failure to include the option dates in the computer system and diary was the "primary reason" for the untimely exercises. U.S. Realty also admits that it "misplaced reliance on an inaccurate Lease Abstract" that was prepared by the prior lease manager, who was also a partner in U.S. Realty. As such, U.S. Realty is not entitled to equitable relief.

### CONCLUSION

¶ 19 We affirm the judgment of the trial court.

¶ 20 Associate Chief Justice RUSSON, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Chief Justice HOWE'S opinion.

---

**3.** Even if Security Investment can be charged with constructive notice of the option deadlines and its right to demand strict compliance therewith as contended for by U.S. Realty (a question we do not decide), our decision to uphold the trial court's finding would not change.