**2021 UT App 129**

## THE UTAH COURT OF APPEALS

TOMI BEAR,
Appellant,
*v.*
LIFEMAP ASSURANCE COMPANY AND
TOOELE COUNTY SCHOOL DISTRICT,
Appellees.

Opinion
No. 20200183-CA
Filed November 18, 2021

Third District Court, Toole Department
The Honorable Matthew Bates
No. 180300011

David S. Head, Attorney for Appellant

Timothy C. Houpt and Jessica P. Wilde, Attorneys
for Appellee LifeMap Assurance Company

Sean D. Reyes and Peggy E. Stone,
Attorneys for Appellee Tooele County
School District

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

ORME, Judge:

¶1     Tomi Bear, an employee of the Tooele County School District (the District), applied for an increase in life insurance benefits for herself and her ailing husband (Husband) during the District's open enrollment period. The insurance provider, LifeMap Assurance Company, required medical histories as part of the application process, which Bear failed to provide. Despite this incomplete application, due to a software glitch, for several

months the District deducted premium payments corresponding to the increased life insurance benefit Bear sought for Husband. When Husband passed away, Bear sought to collect Husband's life insurance benefits. LifeMap denied Bear's claim for the increased benefit amount, asserting that it never received Husband's medical history. Bear sued LifeMap and the District for, in relevant part, breach of contract and breach of the implied covenant of good faith and fair dealing. All three parties moved for summary judgment on both claims, which the district court granted in favor of the defendants. Bear appeals, and we affirm.

BACKGROUND[1]

¶2     Bear was employed by the District from 1993 to 2016. As part of her employment benefits, Bear was eligible to purchase voluntary group life insurance coverage for herself and Husband, which the District had contracted with LifeMap to provide since 2012.

¶3     In 2014, the District elected to self-administer the group life insurance policy (the Group Policy). This included gathering applications from its employees and forwarding them to LifeMap for underwriting. For applications that LifeMap approved, the District calculated and gathered premium payments from employees through payroll deductions, added its own premium payments, and made monthly lump sum payments to LifeMap. Under the Group Policy, the District was precluded from collecting premium payments from an employee unless LifeMap first approved the employee's application. The

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

Group Policy further provided that a "[c]lerical error or omission will not," among other things, "cause an ineligible employee to become insured."

¶4    When making the aforementioned monthly aggregate payments, the District did not identify the individuals whose payroll deductions made up the lump sum to LifeMap. Instead, LifeMap provided a "bill" template that the District was required to fill out, which calculated the total amount of employee premiums the District collected. LifeMap would then review the amount collected to determine whether there was a 10% increase or decrease from the previous month. If the discrepancy was 10% or higher, LifeMap would ask the District to explain the reason for the change. LifeMap was not concerned with discrepancies that were under 10% and would not contact the District in those situations. When reporting on discrepancies exceeding 10%, the District would typically explain the discrepancy by informing LifeMap that employees were either laid off or hired, or that new coverage was added. Based on the District's size, a 10% discrepancy would typically equate to an amount between approximately $2,200 and $2,900 per month. During the 2015–2016 school year, LifeMap was aware that "the District repeatedly failed to provide all the required information in the bill it sent each month to LifeMap," but LifeMap did not affirmatively act to resolve the discrepancies.

¶5    Under the Group Policy, eligible employees could apply within 31 days of eligibility for a guaranteed issue amount for themselves and their spouses without having to provide evidence of insurability (EOI).[2] The maximum guaranteed issue amount was $400,000 for an employee and $50,000 for a spouse,

---

2. The Group Policy defines EOI as "a statement or proof of a person's medical history which [LifeMap] will use to determine if the person is approved for insurance."

for which employees could apply in increments of $10,000. A section of the Group Policy with the heading "WHEN WE MAY REQUIRE EVIDENCE OF INSURABILITY" stated that LifeMap "will require Evidence of Insurability for all persons applying for insurance" if, among other things, an employee did not apply for the guaranteed issue amount within the 31-day window, wished to increase coverage, or wished to apply for coverage over the guaranteed issue amount for themselves or their spouse. The Group Policy provided that "[a]pproval of coverage is subject to [LifeMap's] review of [the employee's] Evidence of Insurability." It further clarified that "[i]f Voluntary Life insurance is approved, [the employee] will receive a Confirmation Statement verifying the amount(s) and Effective Date(s) of coverage."

¶6 Employees could make changes to their benefits once a year during an open enrollment period. During the 2015–2016 school year, the District implemented a new software program, iVisions, for employees to make benefit elections during the open enrollment period. During that time, Bear, using the new software program, requested an increase in the voluntary life insurance policies for herself and Husband from $10,000 to $300,000. After checking the corresponding box to make that request, a pop-up box appeared displaying the following message:

> REMINDER: If you are a new enrollee or increasing coverage, you MUST complete and submit a Health Statement (EOI) to the Benefits Department for approval from LifeMap.
>
> To print out a form, please click the "Previous" button below to find the LifeMap Health Statement

> link or you may visit the Information Center
> located under Employee Resources.[3]

To move to the next step, applicants were required to click a button labeled "OK." Bear did not remember seeing the link to the EOI and did not complete and submit the EOI as part of her request for an increase in life insurance benefits for her and Husband. After Bear submitted the request, iVisions generated a "Benefit Enrollment Confirmation Statement" listing the benefits Bear had elected for the 2015–2016 school year, including an increase in voluntary life insurance benefits in the amount of $300,000 for herself and Husband. The statement also indicated that Bear was authorizing the District to make payroll deductions for the selected benefits.

¶7      At the time of Bear's selection, Husband suffered from several physical ailments, including type II diabetes, stage IV chronic kidney disease, end-stage renal failure, coronary artery disease, and hypertension. Bear would have been required to disclose these medical conditions in an EOI. And it is

---

3. The screenshot of the iVisions pop-up box in the record is from the 2018–2019 open enrollment period. Although Bear points out this fact, she does not assert that the contents of the pop-up inaccurately represented what Bear saw in iVisions in 2015. Instead, she asserts that she "does not remember all of the language that she saw online when she enrolled for the [increase in life insurance] benefits." In any event, an email the District's benefits specialist sent to a LifeMap representative dated March 23, 2016, stated, "During open enrollment when employees reached the screen for voluntary life [insurance], they had the option to elect additional coverage. Regardless of what they chose, the next screen to pop up is a message that states *If you are applying for additional coverage you must print out a Health Statement (EOI) HERE*."

undisputed that LifeMap would have declined the requested increase based on Husband's medical history if Bear's application had included an accurate EOI. Indeed, the Vice President of Risk Management at LifeMap testified that Husband "would have been declined, absolutely."

¶8 Bear does not recall LifeMap notifying her that her request for an increase in voluntary life insurance benefits had been approved as contemplated by the terms of the Group Policy. LifeMap asserted that it "had no information or knowledge concerning any purported application for $300,000 in life insurance for [Husband] prior to [his] death and sent no notice to [Bear] or any communication at all to [Bear] on this subject prior to [Husband's] death."

¶9 In August 2015, as part of the process of closing the open enrollment period and preparing for the September 1 effective date, the District's insurance benefits specialist (Benefits Specialist) saw that the system was set to make deductions from Bear's payroll for two $300,000 life insurance policies, which LifeMap had not approved. Benefits Specialist explained that the system updated employees' benefits based on the requests employees made during open enrollment and that she would later have to manually change the benefit amounts to whatever was actually approved. Accordingly, because Bear had not submitted EOIs for herself and Husband and because LifeMap had not approved an increase to $300,000 for either person, Benefits Specialist manually changed the policy amount back to the original $10,000 in both policies. But when changing the policy amount for Husband, Benefits Specialist neglected to include a dollar sign in front of the 10,000 figure. Benefits Specialist later speculated that this or some other "bug" resulted in an error in which her manual override for Husband's benefits did not take effect. Accordingly, although LifeMap never approved Bear's request for an increase in benefits, between September 4, 2015, and February 5, 2016, the District erroneously

deducted increased premiums from Bear's paychecks for a $300,000 life insurance policy for Husband, which it then transferred to LifeMap as part of the monthly lump sum payment.[4] The District deducted the correct amount corresponding to a $10,000 life insurance policy for Bear during that same time period.

¶10    Husband died in January 2016. Shortly after, Bear contacted Benefits Specialist to submit a claim for $300,000 in life insurance to LifeMap. In February, Benefits Specialist asked LifeMap for clarification because the District's records showed that Bear was entitled to $14,000[5] in life insurance benefits but Bear was claiming to have an approval letter for $300,000. LifeMap replied that it never received an EOI for Husband and that its records did not show that it had issued an approval letter for the requested increase. In April, LifeMap issued a check in the amount of $14,085.34 to Bear, which consisted of the amounts explained in footnote 5, with interest. LifeMap denied Bear's claim for the additional $290,000. The District later refunded the increased premiums for Husband's life insurance policy that were erroneously deducted from Bear's paychecks.

¶11    In 2018, Bear sued LifeMap and the District, alleging breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel against both defendants. Bear additionally alleged negligence, negligent supervision, breach of

---

4. Apparently, these deductions, in combination with other adjustments, did not reach the 10% threshold that would trigger future inquiry, as explained in paragraph four.

5. In addition to the $10,000 under the voluntary life insurance policy, Bear was also entitled to $4,000 under a separate dependent life insurance policy that was automatically available to eligible District employees without premium payments.

fiduciary duty, conversion, and negligent misrepresentation against the District.

¶12 Following discovery, the parties all filed motions for summary judgment. After a hearing on all three motions, the district court granted both defendants' motions and denied Bear's motion. Accordingly, the court dismissed all claims against LifeMap and the District.

¶13 Bear appeals.

ISSUES AND STANDARDS OF REVIEW

¶14 Bear appeals the district court's denial of her motion for summary judgment on her claims for breach of contract and breach of the implied covenant of good faith and fair dealing and its grant of LifeMap's and the District's motions for summary judgment on those same claims.[6] "Summary judgment is only appropriate 'if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Arnold v. Grigsby*, 2018 UT 14, ¶ 8, 417 P.3d 606 (quoting Utah R. Civ. P. 56(a)). Accordingly, "we review a district court's summary judgment ruling for correctness, granting no deference to its legal conclusions, and consider whether it correctly concluded that no genuine issue of material fact existed." *Heslop v. Bear River Mutual Ins.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). We apply this general standard to most of Bear's challenges to the court's summary judgment rulings.

---

6. Bear does not appeal the district court's summary judgment rulings on her claim of promissory estoppel against both defendants and claims of negligence, negligent supervision, breach of fiduciary duty, conversion, and negligent misrepresentation against the District.

¶15 One exception to this general standard applies to review of a district court's summary judgment ruling on a waiver issue. In such cases, "the legal conclusions underlying a trial court's grant of summary judgment . . . are reviewed with some measure of deference." *IHC Health Services v. D & K Mgmt.*, 2003 UT 5, ¶ 6, 73 P.3d 320. This is because "[w]aiver is an intensely fact dependent question, requiring a trial court to determine whether a party has intentionally relinquished a known right, benefit, or advantage." *Id.* ¶ 7. Thus, "in a waiver case decided on a motion for summary judgment, we consider all undisputed material facts in the light most favorable to the nonmoving party before determining whether the trial court's decision on the application of the law of waiver to those facts falls within the bounds of its discretion." *Id.* ¶ 6 (quotation simplified).

ANALYSIS

I. Breach of Contract

¶16 "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *America West Bank Members, LC v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224 (quotation simplified). Bear's claims for breach of contract against LifeMap and the District were at issue in all three motions for summary judgment. We address this claim as it was raised in each of the motions.

A. Bear's Motion for Summary Judgment

¶17 In seeking summary judgment on her breach of contract claim against LifeMap, Bear argued that Utah Code section 31A-23a-410 established the first and second elements of her claim. The statute provides,

Subject to Subsections (2) and (5), as between the insurer and the insured, the insurer is considered to have received the premium and is liable to the insured for losses covered by the insurance and for any unearned premiums upon cancellation of the insurance if an insurer, including a surplus lines insurer:

(a) assumes a risk; and

(b) the premium for that insurance is received by:

(i) a licensee who placed the insurance;

(ii) a group policyholder;

(iii) an employer who deducts part or all of the premium from an employee's wages or salary; or

(iv) an employer who pays all or part of the premium for an employee.

Utah Code Ann. § 31A-23a-410(1) (LexisNexis 2017).[7]

¶18   The district court rejected this argument. It held that the statute did not apply and therefore Bear did not establish the first two elements of her claim because regardless of "[w]hether the premiums were remitted," LifeMap did not "assume the risk." The court stated that under the Group Policy, LifeMap agreed to an assumption of risk only if certain "conditions were met for a particular employee." Thus, because there "is a precondition to [the] statute applying," and as that precondition—the requirement to submit an EOI—was not met, the court concluded that the statute "does not apply here."

---

7. Because the applicable provisions of the Utah Code in effect at the relevant time do not materially differ from those currently in effect, we cite the current version of the code for convenience.

¶19 Bear takes issue with the court's conclusion that, with our emphasis, LifeMap did not "assume[] *the* risk." She insists, again with our emphasis, that the statute instead required the court to determine whether LifeMap "assume[d] *a* risk." Bear contends that this deviation from the statutory language is significant because it led the court to erroneously interpret "'assumes a risk' to mean the specific risk with each individual employee." Bear argues that "the word 'a' in the . . . statute means that there is one unspecified risk, and not a specific or particular risk," which the use of the word "the" would indicate. Thus, Bear asserts that "LifeMap did 'assume a risk' because it is undisputed that it had a group voluntary life insurance policy with the District."

¶20 But even under Bear's interpretation that LifeMap "assume[d] a risk" by entering into the Group Policy with the District, that risk is not completely open-ended. Rather, that risk is defined by the terms of the Group Policy, and the two are inextricably interwoven. Accordingly, under either interpretation of the statute, the terms of the Group Policy determine the extent of the risk of loss LifeMap undertook. And the Group Policy expressly provided that LifeMap "will require [an EOI] for all persons applying for insurance" if, among other things, an employee wished to increase coverage or wished to apply for coverage over the guaranteed issue amount. Thus, even if LifeMap "assume[d] a risk," as Bear contends, by entering into the Group Policy with the District, such a risk was not boundless—LifeMap expressly limited that risk, agreeing to extend coverage to an employee or their spouse above the guaranteed issue amount only upon its review of an EOI and subsequent acceptance of the application. Further, the statute does not require that an insurer assume a risk for any loss incurred by a person making premium payments where, under the terms of the policy, the insurer agreed to assume only a risk of a specific loss. *See Utah Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 33, 355 P.3d 947 (stating that in exchange for premium payments, an insurance carrier "assumes the risk of

loss, within the limits of the policy"). And here, as discussed in more detail below, despite the District's erroneous collection of premium payments from Bear's paychecks, no such contract ever existed between LifeMap and Bear for a $300,000 policy. LifeMap therefore never agreed to assume a risk of any kind beyond the original $10,000 voluntary life insurance policy with regard to Husband. Accordingly, the district court did not err in concluding that the statutory requirement of "assum[ing] a risk" was not met in this case.

### B.    LifeMap's Motion for Summary Judgment

¶21    Bear next contends that the district court erred in granting LifeMap's motion for summary judgment on her breach of contract claim. Specifically, she contends the court erred in determining that (1) the condition precedent for coverage was not met because the Group Policy unambiguously "require[s] an EOI in these circumstances" and (2) LifeMap did not waive the EOI requirement by accepting the higher premium payments.

### 1.    Ambiguity

¶22    Bear asserts that the Group Policy "is ambiguous regarding whether LifeMap's receipt of an EOI is a condition precedent before coverage will start."[8] She relies on *Mellor v. Wasatch Crest Mutual Insurance*, 2009 UT 5, 201 P.3d 1004, which noted that "an ambiguity in a contract may arise . . . because two or more contract provisions, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone." *Id.* ¶ 13 (quotation simplified). Bear contends an ambiguity exists because, with our emphasis, the

---

8. A condition precedent is "an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *McBride-Williams v. Huard*, 2004 UT 21, ¶ 13, 94 P.3d 175 (quotation simplified).

heading of a provision, "WHEN WE *MAY* REQUIRE EVIDENCE OF INSURABILITY," contradicts the body of the provision, which states that LifeMap "*will* require [an EOI] for all persons applying for insurance" that, among other things, exceeds the guaranteed issue amount or is an increase in coverage. And because this alleged ambiguity exists, Bear argues that "these inconsistent statements regarding whether an EOI is required for coverage to start must be read in favor of coverage for [Bear]." In other words, as a result of the alleged ambiguity, she contends "that an EOI is not a condition precedent for coverage under the [Group Policy]." *See State Farm Mutual Auto. Ins. v. DeHerrera*, 2006 UT App 388, ¶ 7, 145 P.3d 1172 ("Because insurance contracts are contracts of adhesion, ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage.") (quotation simplified). We disagree that this inconsistency between the heading and the body creates ambiguity in the contract.

¶23    Under *Mellor*, "an ambiguity in a contract may arise . . . because two or more contract *provisions*, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone." 2009 UT 5, ¶ 13 (emphasis added) (quotation otherwise simplified). Accordingly, an ambiguity may arise from the inconsistency to which Bear points only if the heading is a substantive provision of the contract. And we have previously held that "[c]ontract headings are more appropriately regarded as organizational tools than substantive contract provisions." *McEwan v. Mountain Land Support Corp.*, 2005 UT App 240, ¶ 25, 116 P.3d 955. *See also Vanderwood v. Woodward*, 2019 UT App 140, ¶ 26 n.7, 449 P.3d 983 (stating that a court, in examining the plain meaning of contractual language, may "give the section heading some weight" where "the section heading is completely in harmony with the section's text"). Accordingly, "because the contract heading is not actually part of the contract," no ambiguity arises from any apparent

inconsistency between the heading and the substantive body of the Group Policy. *McEwan*, 2005 UT App 240, ¶ 25. Nor is the heading entitled to "some weight" when it is not "completely in harmony with the section's text." *Vanderwood*, 2019 UT App 140, ¶ 26 n.7.

¶24 The substantive language of the contract provision in issue unambiguously provides, with our emphasis, that LifeMap "*will* require [an EOI] for all persons applying for" an increase in coverage or insurance that exceeds the guaranteed issue amount. This language created a condition precedent, which Bear undisputedly failed to satisfy when she did not submit an EOI for Husband. *See Wade v. Utah Farm Bureau Ins.*, 700 P.2d 1093, 1095–96 (Utah 1985) (holding that failure to satisfy a condition precedent—a medical exam, in that case—resulted in no life insurance coverage). Accordingly, the district court did not err in granting summary judgment to LifeMap on this ground.

2. Waiver

¶25 In granting summary judgment to LifeMap on the issue of waiver, the district court held "that there was no waiver by LifeMap [of the EOI requirement] simply by accepting and receiving the premiums that were paid by Ms. Bear." In the court's view, LifeMap's acceptance of the premiums "could not affect intentional or knowing waiver of its right to demand that EOI simply because it received a lump sum payment of premiums every month from the school district." Bear contends this ruling was in error because "there is [a] genuine issue of fact regarding whether or not LifeMap—through its actions— implicitly intended to enter into a contract with [Bear], and whether it waived the EOI." Specifically, Bear argues that LifeMap knew the District was incorrectly administering the Group Policy because the District failed to provide all required information in the monthly bills it sent to LifeMap during the 2015–2016 school year. Bear asserts that by not immediately

acting to remedy the problems, LifeMap effectively "put its head in the sand." But even when viewing this fact in the light most favorable to Bear, namely by assuming that LifeMap would have discovered the District was erroneously deducting increased premiums from Bear's payroll if it had acted prudently, this does not amount to waiver.

¶26   "A waiver is the intentional relinquishment of a known right." *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 10, 307 P.3d 650 (quotation simplified). "To constitute waiver, there must be (1) an existing right, benefit or advantage, (2) a knowledge of its existence, and (3) an intention to relinquish it." *Id.* (quotation simplified). "Courts do not lightly consider a contract provision waived"—waiver can be established only "where there is an intentional relinquishment of a known right." *Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 17, 422 P.3d 809 (quotation simplified). Such relinquishment may be express or implied, but if the latter, "the party asserting implied waiver must establish that the other party intentionally acted in a manner inconsistent with its contractual rights." *Id.* (quotation simplified). "Courts should exhibit caution in finding implied waiver on the part of [a party] unless the totality of the circumstances demonstrates an unambiguous intent to waive" a contract right. *U.S. Realty 86 Assocs. v. Security Inv.*, 2002 UT 14, ¶ 16, 40 P.3d 586 (quotation simplified). To that end, due to the "intensely fact-dependent" nature of the waiver inquiry, summary judgment on the issue of waiver is appropriate only "if, under the totality of the circumstances, no reasonable fact finder could conclude that [a party] intended to waive its rights." *IHC Health Services v. D & K Mgmt.*, 2008 UT 73, ¶¶ 15, 19, 196 P.3d 588 (quotation simplified).

¶27   Bear, in effect, argues that LifeMap intentionally relinquished its right to review an EOI for Husband because it *could have* discovered that the District was erroneously

withdrawing the higher premium payments from her payroll, but it did not take the necessary action to do so. Bear does not cite any authority in support of this argument. Indeed, the law on waiver is clear: a party must unambiguously intend to waive a contract right before it is relinquished through waiver. *See U.S. Realty 86 Assocs.*, 2002 UT 14, ¶ 16. And without knowing that it was receiving increased premium payments from Bear or even knowing that Bear had applied for a $300,000 life insurance benefit for Husband, LifeMap did not intentionally relinquish its contractual right to review an EOI for Husband before providing increased coverage. Had it reviewed such an EOI, it is undisputed that it "would have . . . declined, absolutely," Bear's application for substantially increased life insurance coverage for Husband. Accordingly, "no reasonable fact finder could conclude that [LifeMap] intended to waive its rights" to review an EOI, *see IHC Health Services*, 2008 UT 73, ¶ 19, and the district court did not err in granting summary judgment to LifeMap on this question.

C.    The District's Motion for Summary Judgment

¶28    Bear next challenges the district court's grant of the District's motion for summary judgment on her breach of contract claim.[9] In relevant part, the court granted summary

---

9. Bear also argues that a genuine issue of material fact exists regarding whether a contract implied-in-fact existed between her and the District. We do not address this argument because it is unpreserved. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). Bear contends that the issue was preserved because "[a] claim for breach of an express contract or for breach of an implied-in-fact contract are both claims for breach of contract and are virtually the same" and the court was

(continued…)

---

(…continued)

therefore presented an opportunity to rule on the issue. But to properly present a district court with an opportunity to rule on an issue for preservation purposes, "the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified). And although claims for breach of contract and breach of a contract implied-in-fact are similar, they are distinct claims and involve separate inquiries. *Compare America West Bank Members, LC v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224 ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.") (quotation simplified), *with Uhrhahn Constr. & Design v. Hopkins*, 2008 UT App 41, ¶ 18, 179 P.3d 808 ("A contract implied in fact is a 'contract' established by conduct. The elements are: (1) the defendant requested the plaintiff to perform work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation.") (quotation simplified). In opposing the District's motion for summary judgment, Bear raised and discussed only the elements of a breach of contract claim and did not discuss, much less support with relevant legal authority, the contract implied-in-fact argument she now raises on appeal. Accordingly, this argument is not preserved for appeal.

In the alternative, Bear argues that the plain error exception to the preservation rule applies. But because Bear asserted plain error for the first time in her reply brief, we do not consider it. *See Marcroft v. Labor Comm'n*, 2015 UT App 174, ¶ 4, 356 P.3d 164 ("We have consistently refused to consider arguments of plain error raised for the first time in an appellant's reply brief, even if the plain error argument is in response to a dispute over

(continued…)

judgment to the District because Bear had not met her burden of showing "that there was an offer of life insurance, an acceptance of that offer of life insurance, and a meeting of the minds between the parties that that life insurance contract existed." Specifically, the "alleged offer and acceptance was performed through a period of open enrollment and ultimately was consummated in . . . an exchange between Ms. Bear and a computer in the iVisions system." And "[m]ost of what [Bear] had to say" on the subject during her deposition "was that she did not remember the process that well, [and] that she could not remember seeing certain documents." In contrast, the printouts of the pop-up and other documents the District provided "are extremely clear that any application for life insurance, over the guaranteed amount, requires an EOI." Thus, although the court acknowledged that the District deducted premium payments from Bear's paychecks and that Bear received a confirmation statement "that showed she applied for $300,000 in benefits for her and her husband," the court nonetheless concluded that Bear had not satisfied her evidentiary burden.

¶29   "[W]here the burden of production falls on the nonmoving party, . . . the moving party may carry its burden of persuasion . . . by showing that the nonmoving party has no evidence to support an essential element of a claim." *Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581. Here, the district court determined that Bear had failed to produce evidence to support the first element of a breach of contract claim: the existence of an enforceable contract. *See America West Bank Members, LC v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224. "An enforceable contract . . . consists of the terms of a bargained-for exchange between the parties. And the terms of the bargain are defined by the meeting

---

(…continued)

preservation raised for the first time in the appellee's brief.") (quotation simplified).

of the minds of the parties—through an offer and acceptance upon consideration." *Rossi v. University of Utah*, 2021 UT 43, ¶ 31. *See Syme v. Symphony Group LLC*, 2018 UT App 212, ¶ 13, 437 P.3d 576 ("A binding contract exists where it can be shown that the parties had a meeting of the minds as to the integral features of the agreement and that the terms are sufficiently definite as to be capable of being enforced.") (quotation simplified). "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *Lebrecht v. Deep Blue Pools & Spas Inc.*, 2016 UT App 110, ¶ 13, 374 P.3d 1064 (quotation simplified). "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Id.* (quotation simplified).

¶30   Bear contends the court overlooked evidence she presented of the District's offer of life insurance to eligible employees, including herself. She first points to an agreement that the Tooele Educational Support Professional Association negotiated with the District on behalf of the District's employees. The agreement indicated that "Insurance Coverage will be provided for all seven (7) hour employees" and that "Employees are responsible for updating dependent coverage, change in status, and open enrollment." Bear also points to a flyer the District distributed to its employees informing them of the dates of the 2015–2016 open enrollment period and indicating that they could enroll in, among other things, voluntary life insurance. Lastly, Bear relies on the deposition testimony of Benefits Specialist confirming that Bear had applied for $300,000 in life insurance benefits for herself and Husband.[10]

---

10. Bear also lists additional evidence in support of her contention that she accepted the District's alleged offer of life insurance benefits. Because we conclude that Bear did not

(continued…)

¶31    But this evidence supports only a conclusion that the District offered to include voluntary life insurance as part of its benefits package for eligible employees. This is not a point of contention in this case. Rather, the issue of fact is whether the District offered to *directly* pay life insurance benefits to its employees. And even when viewing the aforementioned evidence and all reasonable inferences in the light most favorable to Bear, they do not support a conclusion that the District made such an offer. *See Christensen & Jensen, PC v. Barrett & Daines*, 2008 UT 64, ¶ 19, 194 P.3d 931.

¶32    Indeed, the evidence supports the opposite conclusion—that the District offered to facilitate (and pay for part of) various insurance benefits through third-party insurance carriers. For example, in addition to providing the dates for the 2015–2016 open enrollment period, the flyer to which Bear points also indicated changes made to insurance carriers from the previous year. Also, the flyer informed employees that the District had switched carriers for long-term disability insurance and that it had added another carrier option for vision insurance. As concerns voluntary life insurance, the flyer indicated that no changes had been made from the previous year. And Bear has not provided evidence that prior to the 2015–2016 enrollment period, the District directly paid life insurance benefits to its employees. To the contrary, the record is clear that the District contracted with LifeMap to provide life insurance benefits to its employees as early as 2012. Furthermore, although the District deducted increased premiums from Bear's pay over a four-month period, it is undisputed that the District forwarded

---

(…continued)
provide evidence that the District offered to directly provide life insurance to its employees, we do not address whether evidence existed to support a conclusion that Bear accepted the purported offer.

those premiums to LifeMap—the intended insurance carrier—as part of the monthly lump sum payment.

¶33 Thus, because the evidence to which Bear points does not contradict the evidence in the record that the District offered to facilitate life insurance benefits for eligible employees through the Group Policy it entered with LifeMap—and not to directly pay the benefits itself—a dispute of material fact does not exist on this point. *See* Utah R. Civ. P. 56; *Salo*, 2018 UT 7, ¶ 2. Accordingly, the district court did not err in granting summary judgment in favor of the District on the rationale that an enforceable contract did not exist for the District to directly pay any life insurance benefits for Husband.[11]

## II. Implied Covenant of Good Faith and Fair Dealing

¶34 "The implied covenant of good faith and fair dealing . . . inheres in every contract." *Backbone Worldwide Inc. v. LifeVantage Corp.*, 2019 UT App 80, ¶ 16, 443 P.3d 780 (quotation simplified). It "prohibits the parties from intentionally injuring the other party's right to receive the benefits of a contract, and prevents either party from impeding the other's performance of [their] obligations by rendering it difficult or impossible for the other to continue performance." *Id.* (quotation simplified). But the covenant of good faith and fair dealing (the covenant) cannot, among other things, "compel a contractual party to exercise a

---

11. Because we conclude that an enforceable contract did not exist for the District to directly pay life insurance benefits for Husband, we do not address Bear's argument that a dispute of material fact exists as to whether the District waived its contractual right to review an EOI before extending life insurance benefits. It is clear that such right belonged to LifeMap, not the District.

contractual right to its own detriment for the purpose of benefitting another party." *Id.* (quotation simplified).

¶35 Bear challenges the district court's grant of summary judgment on its claim against LifeMap and the District for breach of the covenant. As against LifeMap, Bear merely asserts that it "purposefully injured [her] right to the foregoing $300,000 in voluntary life insurance benefits when it denied [her] rightful claim." But as discussed above, the Group Policy is unambiguously clear that Bear was required to submit an EOI for Husband as part of the application process, which contractual right LifeMap did not waive, and it is undisputed that she failed to include an EOI as part of her application. It is further undisputed that had she submitted an EOI, LifeMap would have denied the application based on Husband's highly problematic medical history. Accordingly, LifeMap had the contractual right to deny Bear's claim and therefore did not violate the covenant by doing so. *See id.* ¶ 24 ("As long as the party has an express and objectively determined [contractual] right, and absent elements of legal waiver being met, that party may exercise that right, and its motives for doing so are irrelevant, despite the existence of the implied covenant.") (quotation simplified).

¶36 And concerning the District, Bear's argument is even more meager. Her argument on this point is limited to the assertion that "[a]s the implied covenant of good faith and fair dealing inheres in all contracts, there is also a genuine issue of fact on [her] claim for breach of [the] implied covenant of good faith and fair dealing against the District based upon the above facts." Other than vaguely referencing "the above facts," Bear does not identify what conduct on the part of the District constituted a breach of the covenant. Because we have concluded that there was no contract by which the District would be required to directly pay Husband's life insurance benefits, the District's refusal to make such payment and its erroneous

deductions of premium payments from Bear's paychecks cannot be the ground for Bear's claim against it. To the extent Bear references the broader employment contract in which the District agreed to provide her the option to apply for life insurance through the Group Policy, it is also unclear what facts Bear contends support a conclusion that the District breached the covenant. Based on this, Bear has failed to meet her burden of persuasion on this issue, and we do not address it further. *See* Utah R. App. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal."); *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which a party may dump the burden of argument and research.") (quotation simplified).

## CONCLUSION

¶37    The district court did not err in denying Bear's motion for summary judgment and in granting LifeMap's and the District's motions for summary judgment. Affirmed.

———————